SAMUEL E. WING, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11994-81.    Filed July 11, 1983.

---

18

*Theodore Z. Gelt, Lewis H. Mathis,* and *Joseph B. Hurst, Jr.,* for the petitioner.

*Glenn D. Wilkinson*, *William F. Garrow*, and *James F. Podheiser*, for the respondent.

## OPINION

DAWSON, *Chief Judge*: Respondent determined a deficiency in petitioner's Federal income tax in the amount of $25,888 for the taxable year ended December 31, 1977.

The issues presented for decision are: (1) Whether the amendment to section 1.612–3(b)(3), Income Tax Regs., by the T.D. 7523 is valid; and (2) if so, whether any portion of the $60,000 amount paid[1] by petitioner in the form of cash plus a nonrecourse promissory note meets the requirements of the regulation and is deductible in the year paid or accrued.

## FACTS

This case was submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and attached exhibits are incorporated herein by reference. The pertinent facts are summarized below.

Petitioner resided in Denver, Colo., when he filed the petition in this case. He timely filed his 1977 income tax return with the Internal Revenue Service Center in Ogden, Utah.

Petitioner joined with Messrs. Nelson E. Tamplin (Tamplin) and A. G. Foust (Foust) to form a joint venture called the Weston County Coal Project (hereinafter the project). The project's purpose was to engage in coal mining operations on approximately 1,500 acres of Weston and Crook Counties in Wyoming. A joint operating agreement dated October 8, 1977, was signed by the parties to that effect, with Foust being designated as operating manager and Tamplin and petitioner designated as co-owners.[2] Petitioner's share of the working interest in the project was 33⅓ percent. By provision of the joint operating agreement, all the parties agreed to make an election pursuant to section 761(a).[3] Petitioner elected to

---

[1]The use of the term "paid" in the summary of facts is for narrative convenience only and is not intended to represent any factual conclusion concerning the true nature of the transaction discussed.

[2]Foust was also a co-owner in the project.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code of

report his income and losses with respect to the project in accordance with the accrual method of accounting.

A mining sublease (hereinafter the agreement) was signed by petitioner on behalf of the joint venture and Everett Wing on behalf of Everett Corp. on October 8, 1977. Everett Wing is petitioner's father and the sole shareholder of Everett Corp. The agreement provided that Everett Corp. would sublease an undivided one-third interest in Wyoming State coal leases Nos. 0-32586 and 0-32587 (located within the Powder River Basin in Wyoming and hereinafter referred to as the leases) to petitioner for a period of 10 years. This agreement further provided for payment of an "advance minimum royalty" of $60,000 ($6,000 per year for 10 years) to be paid in the form of $10,000 cash plus a nonrecourse promissory note in the amount of $50,000 upon execution of the agreement.

On October 20, 1977, petitioner paid $10,000 to Everett Corp. by check and executed and delivered to Everett Corp. a nonrecourse promissory note in the amount of $50,000 (bearing interest at the rate of 7 percent per year) in satisfaction of the agreement. The note was collateralized by all the coal underlying the property leased from the Everett Corp. Payment was to be made from all proceeds received by the project from the leased premises at the rate of 50 cents per ton sold. All payments were to apply to interest first, and the balance, if any, was to be applied to reduction of principal. The note is payable to the Everett Corp., is secured by the leases,[4] bears interest, has a definite maturity date, and has a fixed amount of principal. All outstanding sums were due and payable on December 31, 1987.[5] In the event that petitioner failed to make

---

1954 as amended and in effect during the year in issue. Sec. 761(a) provides rules whereby the joint venture may elect to exclude itself from the application of subch. K of the Code, relating to the taxation of partnerships.

[4] The stipulation states that the "coal reserves" secure the note. This is contrary to the record, as Everett Corp. was a sublessor. Therefore, only the mineral interest subject to the lease was the security for the note. See the promissory note, note 5 *infra*.

[5] The pertinent passages of the sublease agreement and the promissory note read as follows:

5. *Term of Lease.*

\* \* \* \* . \* \* \*

(b) If in the judgment of the Lessee, the merchantable, commercially available and economically recoverable coal in said Leased Premises is not exhausted at the expiration of the term referred to in paragraph 5(a), Lessee shall have the option to extend the term of this lease, for as many successive one year periods as shall in the discretion of the Lessee be

payments in accordance with the terms of the note, the Everett Corp. could foreclose upon the entire mineral interest secured by the leases to satisfy payment, but no more. Such arrangements were not unusual in the mineral financing area.

Petitioner has made the following payments of interest on the note:

| Date | Amount of payment |
|---|---|
| 12/27/78 | $534.93 |
| 2/22/79 | 300.00 |
| 3/30/79 | 1,000.00 |
| 6/08/79 | 250.00 |
| 10/23/79 | 1,000.00 |
| 12/26/79 | 1,500.00 |
| 12/17/80 | 1,200.07 |
| 12/15/81 | 500.00 |
| 3/15/82 | 500.00 |

---

required to mine the coal to exhaustion.

\* \* \* \* \* \* \*

6. *Royalties.* The Lessee [petitioner] shall pay as rental for said coal and mining rights and privileges hereby leased, a royalty of 3% of the net pit price or $.50 per ton of 2,000 pounds of run-of-mine merchantable coal hereby leased plus any royalty Lessor [Everett Co.] owes to the State of Wyoming and other royalties Lessor has committed to pay.

(a) Lessee will pay Lessor an advance minimum Annual Royalty of $60,000 ($6,000 for each of the first ten years of the sublease). The advance minimum Annual Royalty payment herein provided for shall be recoupable at the rate of $.50 per ton of coal sold or mined, removed and marketed. The minimum annual advance Royalty shall be paid with $10,000 cash upon execution of this sublease and the delivery of the Lessee's non-recourse promissory note of $50,000.

\* \* \* \* \* \* \*

### NON-RECOURSE PROMISSORY NOTE

For value received, the undersigned hereby promises to pay to Everett Corporation the sum of Fifty Thousand Dollars ($50,000) on December 31, 1987 together with interest at the rate of 7% per annum, at \* \* \* such \* \* \* place as may be designated \* \* \* by the payee: Should any further sums be lent to payor by payee during 1977, such sums shall be added to the principal then outstanding and shall be repaid under the terms of this note.

This is a nonrecourse note. Collateral is to be all coal leased to payee under the terms of his sublease with Everett Corporation. Payment is to be made from all proceeds received by payor from the leased premises, at the rate of $.50 per ton sold.

All payments shall be applied to the payment of interest first, and the balance, if any, shall then be applied to the reduction of principal. All outstanding sums shall be due and payable on December 31, 1987. In the event that payor fails to make payments in accordance with the terms of this note, payee may foreclose upon the collateral securing repayment of this note, provided, however, that payee shall be required to bid on the collateral at a price not less than the total amount of principal and interest then owing hereon.

(Signed and dated)

In the payment made on December 17, 1980, $234.93 was allocated by petitioner as advance minimum royalties and the remainder as interest.

Petitioner claimed a deduction for an advance minimum annual royalty payment accrued for the project on Schedule C of his 1977 individual Federal income tax return in the amount of $50,000: This deduction corresponded to the promissory note payable to the Everett Corp. Petitioner filed an amended return for 1977, alleging entitlement to an additional $10,000 deduction as an advance minimum royalty for the cash payment which was made to Everett Corp. on October 20, 1977. The entire deficiency amount results from respondent's disallowance of the $50,000 deduction. Respondent also contests petitioner's claimed deduction for the $10,000 cash payment.

The parties agree that the note and the $10,000 cash payment by petitioner had economic purpose and substance other than the avoidance of taxes and that the coal reserves subject to the leases are at least sufficient to permit recoupment of the advance minimum royalty payment over the term of the lease.

## THE OPERATIVE REGULATION

In disallowing the claimed deduction, respondent relies on section 1.612–3(b)(3), Income Tax Regs., as amended by T.D. 7523, 1978–1 C.B. 192.[6]

The regulation, prior to amendment, indicated different treatment of the claimed deductions.[7]

On October 29, 1976, the Service issued News Release IR-1687 announcing that proposed regulations under section 612

---

[6]Hereinafter, references to "the regulation" shall be to sec. 1.612–3(b)(3), Income Tax Regs.

[7]In its prior form, sec. 1.612–3(b)(3), Income Tax Regs., read, in part, as follows:

(3) The payor, at his option, may treat the advanced royalties so paid or accrued in connection with mineral property as follows:

(i) As deductions from gross income for the year the advanced royalties are paid or accrued, or

(ii) As deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid, is sold.

As proposed, the amended regulation provided, in part, as follows:

which would modify the treatment of advanced royalties under mineral leases entered into as of that date would be published in the Federal Register. A copy of the proposed regulations accompanied the release. The supposed effect of the amendment was that lump-sum advanced royalties could now be deducted only in the year of sale of the mineral product with respect to which the royalty was paid. In the event that coal was sold before production, a taxpayer would now have to wait until the coal was actually mined before deducting advance royalties. In two earlier revenue rulings, the Service

---

(b) *Advanced Royalties.* * * *

    *      *      *      *      *      *      *

(3) The payor shall treat the advanced royalties so paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. However, in the case of advanced royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor at his option, may instead treat the minimum royalty payments as deductions from gross income for the year in which the minimum royalties are paid or accrued. For purposes of this paragraph, a minimum royalty provision requires that substantially uniform royalty payments be made at least annually over the life of the lease. * * *

The final regulation, as amended, provides, in part, as follows:

(b) *Advanced royalties.* * * *

    *      *      *      *      *      *      *

(3) The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. For purposes of the preceding sentence, in the case of mineral sold before production the mineral product is considered to be sold when the mineral is produced (i.e., when a mineral product first exists). However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. See section 446 (relating to general rule for methods of accounting) and the regulations thereunder. For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of a least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. For purposes of the preceding sentence, in the case of a lease which is subject to renewal or extention, the period for which it can be renewed or extended shall be treated as part of the term of the original lease. * * * The provisions of this subparagraph do not allow as deductions from gross income amounts disallowed as deductions under other provisions of the Code, such as section 461 (relating to general rule for taxable year of deduction), section 465 (relating to deductions limited to amount at risk in case of certain activities), or section 704(d) (relating to limitation on allowance to partners of partnership losses). [Differences from the proposed regulation are underscored.]

had concluded that lump-sum royalties were deductible when paid or accrued. Rev. Rul. 70–20, 1970–1 C.B. 144, and Rev. Rul. 74–214, 1974–1 C.B. 148. The news release also announced the suspension of these rulings. In the November 2, 1976, Federal Register, a notice of proposed rulemaking containing the same proposed regulation which accompanied News Release IR-1687 was published. The Service announced in its November 15, 1976, issue of the Internal Revenue Bulletin that the said amendment to the regulation was proposed, that hearings would be held on November 30, 1976, and the last date for submitting comments would be November 23, 1976.

The final version of the regulation was published on December 19, 1977, in T.D. 7523, 42 Fed. Reg. 63640, 1978–1 C.B. 192 (the amendment). This version was substantially the same as that published in News Release IR-1687, though petitioner does not concede this issue. On the same day that T.D. 7523 was released the Service revoked Rev. Rul. 70–20 and Rev. Rul. 74–214 in Rev. Rul. 77–489, 1977–2 C.B. 177.

## CONTENTIONS OF THE PARTIES

Respondent contends that the cash and note both represent an advance royalty payment. As such, under the regulation and applicable law, respondent argues that none of the $60,000 is deductible in 1977 but only in the year the coal in respect of which the advance royalty was paid or accrued is sold.[8] In the alternative, respondent contends that if the royalty is deductible when paid or accrued, then the nonrecourse note given by petitioner was contingent and speculative and therefore does not meet the "all events" test for deductibility. See sec. 1.461–1(a)(2), Income Tax Regs. Also, respondent contends that petitioner is precluded from deducting any advance royalty payment since it does not clearly reflect income within the meaning of section 446.

On the other hand, petitioner contends that the amendment to the regulation is invalid because: (A) Respondent failed to comply with section 553 of the Administrative Procedure Act; (B) administrative practice reflected in the regulation prior to its 1977 amendment by T.D. 7523 had acquired the force of law

---

[8]In 1977, no coal as yet had been mined at the project.

and could not be altered without congressional action by virtue of the "legislative reenactment doctrine"; (C) the retroactive effective date of the amendment to October 29, 1976, constituted an abuse of the Commissioner's discretion under section 7805(b) and is a violation of due process of law; and (D) the amendment was made in violation of the Service's own procedural rules.

If the amendment is upheld, petitioner alternatively contends that he complied with the regulation because the payments were made as a result of an advanced minimum royalty provision. Moreover, petitioner contends that by virtue of its economic viability, the nonrecourse note delivered by him in payment of the advanced royalties was accruable and deductible in the year executed. Petitioner filed an affidavit with this Court stating that he relied: (1) On the advice of co-owner Nelson E. Tamplin, a certified public accountant, when formulating the transaction; (2) on the regulation as it read prior to amendment; (3) on the proposed regulation as announced November 2, 1976; and (4) on Rev. Ruls. 74–214 and 70–20 prior to their revocation by Rev. Rul. 77–489. The sublease transaction was implemented and closed prior to the adoption of the above amendment and prior to the issuance of Rev. Rul. 77–489 and Rev. Rul. 80–70, 1980–1 C.B. 104. In these later rulings, the Commissioner disallowed any current deductions for taxpayers in factual settings similar to those of the instant case.

## Issue 1. Amendment to the Regulation

Petitioner entered into the sublease transaction on October 8, 1977, with payment occurring October 20, 1977. This was almost 1 year after the announcement of respondent's proposed regulation on October 29, 1976, and publication in the Federal Register on November 2, 1976.

The final regulation was formally adopted December 14, 1977, retroactive to October 29, 1976. The final form of the regulation differed from the previous version. No additional comments were accepted after those heard November 30, 1976. A limited additional statement accompanied the proposed form of the regulation in T.D. 7523. Petitioner contends these facts render the amendment invalid.

## A. COMPLIANCE WITH APA SECTION 553

Petitioner's first contention is that since the regulation was not promulgated in accordance with the Administrative Procedure Act (APA), 5 U.S.C. sec. 551 et. seq., 60 Stat 237, it is invalid.[9] He makes five arguments why the APA has been violated: (1) Since the regulation is a "legislative" rather than "interpretative" rule, a violation of the APA compels us to invalidate the amendment. (2) While notice was admittedly provided by publication of the proposed change in the Federal Register, section 553(d) of the APA was violated because the final form of the regulation was not published at least 30 days prior to its effective date. (3) After giving notice and receiving comments as to the amendment, the Service did not incorporate into its final rule a concise general statement of the new regulation's basis and purpose which is in violation of section 553(c) of the APA. (4) The absence of such a statement rendered the right to offer comments meaningless. (5) As the final form of the regulation differed substantially from the proposed form, a new opportunity to comment should have been provided, which was not done. We will address these arguments seriatim.

Respondent did not offer any contrary arguments to the issues raised above, except for the 30-day requirement of APA section 553(d).[10]

### 1. *Legislative vs. Interpretative Rules*

Though the Commissioner must conform generally to the

[9]For ease of discussion, occasional subsequent references to "APA sections" shall be to corresponding section numbers in 5 U.S.C. sec. 551 et seq., rather than to the section number in the original act.

[10]Although the original petition questioned whether the amendment to the regulation was valid, respondent contends that petitioner's arguments constitute issues that are being raised for the first time on brief. He asserts that we therefore should not consider them because of undue surprise and disadvantage. See, e.g., *Aero Rental v. Commissioner*, 64 T.C. 331, 338 (1975). Respondent stapled unedited portions of his brief filed in *Wendland v. Commissioner*, 79 T.C. 355 (1982), discussed *infra*, to the back of his reply brief in the event we would consider the issue. We have not attached much weight to this material because the *Wendland* case did not address a large number of the arguments raised by petitioner here.

As to the merits of respondent's contention, we fail to see how he was surprised by petitioner's arguments, as respondent himself stated in his original brief "Petitioner is taking the position that the amendment is invalid." Also, respondent is placed at no disadvantage. Any new legal arguments advanced by petitioner could have been addressed at length in respondent's reply brief. This respondent chose not to do. In light of our decision in this case, we need not address respondent's contentions further.

requirements of the APA in promulgating regulations,[11] that act does not govern every administrative decision. The APA contemplates two rulemaking procedures: formal and informal. 5 U.S.C. sec. 553(c). Formal rules are those required by statute to be made on the record after opportunity for an agency hearing. All other rulemaking is deemed informal ("notice and comment") rulemaking. Petitioner concedes that the attempted amendment represents informal rulemaking.

The requirements of APA section 553 generally apply only to substantive or legislative rules.[12] Interpretative rules are excepted. 5 U.S.C. sec. 553(b)(A). Therefore, revenue rulings, which merely represent opinions by respondent, have been held to be the classic example of an interpretative ruling and exempt from the notice and comment provisions of APA section 553. *Eastern Kentucky Welfare Rights Organization v. Simon*, 506 F.2d 1278 (D.C. Cir. 1974), vacated on other grounds 426 U.S. 26 (1976); *Lugo v. Simon*, 453 F. Supp. 677 (N.D. Ohio 1978); *Investment Annuity, Inc. v. Blumenthal*, 442 F. Supp. 681 (D. D.C. 1977); *National Restaurant Association v.*

[11]See *Wendland v. Commissioner, supra.* See also sec. 601.601(d), IRS Statement of Procedural Rules, 26 C.F.R. Part 601.

[12]Differences exist in the nomenclature between administrative law and tax law. Under the APA, "rule making" means agency process for formulating, amending, or repealing a rule. 5 U.S.C. sec. 551(5). A "rule" is the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency. 5 U.S.C. sec. 551(4). Under the APA there are two kinds of rules, interpretative and substantive. A "legislative" rule is synonymous with substantive. The difference between interpretative and substantive rules was expressed in *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952):

"Administrative officials frequently announce their views as to the meaning of statutes or regulations. Generally speaking, it seems to be established that 'regulations' * * * are those which create law, usually implementary to an existing law; whereas interpretive rules are statements as to what the administrative officer thinks the statute or regulation means. * * * "

See also *Pickus v. United States Board of Parole*, 507 F.2d 1107, 1113 (D.C. Cir. 1974); *National Association of Insurance Agents, Inc. v. Board of Governors of Federal Reserve System*, 489 F.2d 1268, 1270 (D.C. Cir. 1974).

In tax parlance, a "rule" refers to a revenue ruling, which does not rise to the dignity of a treasury regulation. The latter is accorded great weight. See *National Muffler Dealers Association v. United States*, 440 U.S. 472 (1979); *Estate of Lang v. Commissioner*, 64 T.C. 404, 407 n. 4 (1975).

Therefore, a "rule" under the APA embraces *both* treasury regulations and revenue rulings, whereas a "regulation" as used in regard to the APA is a "substantive or legislative rule." The converse is not necessarily true, as discussed in the text following.

*Simon,* 411 F. Supp. 993 (D. D.C. 1976); *American Standard, Inc. v. United States,* 220 Ct. Cl. 411, 602 F.2d 256 (1979). Similarly "interpretative" treasury regulations, though usually deemed to have the force of law, still qualify as "interpretative" rules of the Secretary of the Treasury, and therefore are exempt from the requirements of 5 U.S.C. sec. 553(c). *Pickus v. United States Board of Parole,* 507 F.2d 1107, 1113 (D.C. Cir. 1974) (dicta).[13]

However, in the instant case, section 1.612–3(b)(3), Income Tax Regs., was promulgated pursuant to specific statutory authority. Section 611(a) provides that taxpayers are allowed a reasonable allowance for depletion "to be made under regulations prescribed by the secretary." In addition, section 1.611–0, Income Tax Regs., provides in part:

> Sections 1.611–1 through 1.614–8, inclusive, are prescribed under the authority granted the Secretary * * * by section 611(a) of the Code to prescribe regulations * * *

Where regulations have been enacted pursuant to a specific statutory authority in addition to that provided by section 7805(a), we have afforded them great weight. We therefore agree with petitioner that section 1.612–3(b)(3), Income Tax Regs., is a substantive rule, legislative in character, and therefore is subject to the basis and notice requirements of 5 U.S.C. secs. 553(c) and 553(d).[14]

## 2. *Notice Requirement*

Under the APA, a substantive rule must be published 30 days before its effective date except as otherwise provided by the agency for good cause found and published with the rule, or if the rule grants or recognizes an exemption or relieves a restriction.[15] Petitioner asserts that since formal adoption of

---

[13]See *Gibson Wine Co. v. Snyder, supra.*

[14]Congress' delegation of *legislative* rulemaking power was expressed in S. Rept. 960, 70th Cong., 1st Sess. (1928), 1939–1 C.B. (Part 2) 409, 419, as follows:

"The Committee believes it to be impractical to attempt by legislation to prescribe the various detailed and complicated rules necessary to meet the many differing and complicated situations. Accordingly, it has found it necessary to delegate power to the Commissioner to prescribe regulations *legislative in character* covering them. * * * [Emphasis supplied.]"

[15]5 U.S.C. sec. 553(b), (c), and (d).

the regulation occurred with the publication of T.D. 7523 in the Federal Register on December 19, 1977, made effective upon adoption retroactive to October 29, 1976, this requirement of the APA was violated. Petitioner further claims that the immediate implementation of the regulation worked a hardship on him by foreclosing any chance of negotiation with the sublessor regarding adjustment of the lease terms to the regulation's requirements; specifically, whether the lease sets forth a "minimum royalty provision."

The purpose of the 30-day requirement of 5 U.S.C. sec. 553(d) is to allow the affected public an opportunity to prepare for the rule or take other action which its adoption may necessitate. *Rowell v. Andrus*, 631 F.2d 699, 703 (10th Cir. 1980).

This Court addressed this same issue in *Wendland v. Commissioner*, 79 T.C. 355 (1982).[16]

We held that section 7805(b) does not conflict with the purpose behind 5 U.S.C. sec. 553(d), which is to alert concerned parties before immediate implementation of agency rules (though there may be a technical noncompliance with the literal statute). See *United States v. Gavrilovic*, 551 F.2d 1099, 1104 n. 9 (8th Cir. 1977). Since the taxpayers in *Wendland* were aware of the amendment's intended retroactivity, they had ample opportunity to prepare for the final publication of the regulation. We therefore determined that the amendment to the regulation complied with the purpose of APA section 553(d).

After examining the facts before us, we think our opinion in *Wendland* is controlling. Moreover, in the instant case, the project did not formally exist until approximately 1 year after

---

[16]In *Wendland*, the taxpayers were members of a limited partnership (TCR) engaged in coal mining. TCR paid $3 million to obtain valuable assets necessary to the ongoing mining operations. Among these assets were coal leases to be satisfied out of production. The $3 million payment consisted of $650,000 cash and a $2,350,000 nonrecourse note secured by the reserves. The taxpayers contended that the entire $3 million represented payment of advance royalties and claimed a deduction under sec. 1.612–3(b)(3), Income Tax Regs., as it read prior to amendment. The transactions in *Wendland* were finalized on Dec. 31, 1976, 2 months after the Oct. 29, 1976, effective date of the amendment. The APA requirement that the final rule be published 30 days prior to its *effective* date appeared to conflict with the Secretary's power to designate which of his regulations shall take effect retroactively under sec. 7805(b). Sec. 7805(b) reads as follows:

SEC. 7805(b). RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

the release of the proposed regulation. Hence, we fail to see how petitioner could not have received notice of the proposed changes and governed his plans accordingly. In addition, considering the father-son relationship that existed between the representatives of Everett Corp. and the project, it strains credulity that there was no possibility of negotiation between the parties to adjust the lease terms to the regulation's requirements. Instead, it appears that petitioner was more concerned with entering into the agreement before respondent's regulation could become final. It follows that petitioner would not have suffered adverse effects from any technical noncompliance with the 30-day requirement of APA section 553(d) and, therefore, the amendment to the regulation is valid as to this issue. *Nance v. Environmental Protection Agency*, 645 F.2d 701, 709 (9th Cir. 1981); *Wendland v. Commissioner, supra.*[17]

### 3. *Basis and Purpose Statement*

In addition to adequate notice, APA section 553(c) also requires each promulgated rule to have accompanying it a statement of that rule's basis and purpose.[18] The reason for requiring the statement of basis and purpose is to enable courts to be aware of the legal and factual framework underlying the agency's action, and the lack of an accompanying rationale may render a regulation invalid because a court requires such a statement in order to evaluate the reasonableness of a regulation. *National Welfare Rights Organization v. Mathews*, 533 F.2d 637 (D.C. Cir. 1976); *American Standard,*

---

[17]Even though in *Wendland* we stated that we see no inherent conflict between the APA and the Code, were such a conflict to in fact be unavoidable, this would not alter our decision. The APA is a general statute, applying equally to all Federal agencies (unless excepted). The Code, and more specifically sec. 7805, reflects a *specific* congressional action to address a particular issue (the power of the Secretary to establish regulations necessary to accomplish the raising and collecting of revenue). If two statutes conflict or overlap in application, the rule is that the more specific of the two takes precedence. As stated by the Supreme Court:

"for it is familiar law that a specific statute controls over a general one 'without regard to priority of enactment.' [*Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961).]"

[18]APA sec. 553(c) reads in part:

"After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. * * * "

*Inc. v. United States, supra.* See generally *Chrysler Corp. v. Brown,* 441 U.S. 281, 313 n. 43 (1979).

In interpreting the reasonableness of the regulation, petitioner agrees that the standard of judicial review provided by 5 U.S.C. sec. 706 is whether the agency's action is "arbitrary and capricious." *Amoco Oil Co. v. E.P.A.,* 501 F.2d 722, 739 (D.C. Cir. 1974), and cases cited therein. See *American Public Gas Association v. Federal Power Commission,* 567 F.2d 1016 (D.C. Cir. 1977), cert. denied 435 U.S. 907; *Sea-Land Service, Inc. v. Kreps,* 566 F.2d 763 (D.C. Cir. 1977).

In T.D. 7523, the sole statement connected to the above section of the APA reads as follows:

The amendments were proposed in order to modify the treatment of advanced royalties referred to in section 1.612–3(b) paid or accrued in connection with mineral property. After consideration of all comments regarding the proposed amendments, this Treasury Decision is adopted. [42 Fed. Reg. 63640 (1977).]

Petitioner urges that this limited statement amounts to no statement at all, and that the absence of how and why the amendment was adopted is *per se* arbitrary and capricious and sufficient to invalidate the amendment. We do not agree.

Implicit in the rationale which requires the statement is the exception to the rule's overtechnical application. When the basis and purpose of the rule is inherent in the rule and the enabling statute under which it was published, 5 U.S.C. sec. 553(c) is satisfied and no separate statement is required. *American Standard, Inc. v. United States,* 220 Ct. Cl. at 431; *Alabama Association of Insurance Agents v. Board of Governors of Federal Reserve System,* 533 F.2d 224 (5th Cir. 1976). Less than clear statements may be sufficient, and regulations with no statement of purpose have been upheld. *Citizens To Save Spencer County v. E.P.A.,* 600 F.2d 844 (D.C. Cir. 1979); *American Standard, Inc. v. United States, supra.*[19]

In applying the "arbitrary and capricious" standard within the meaning of the APA, a reviewing court must narrowly consider whether the agency's decision was based on consideration of relevant factors and whether there has been a clear error of judgment. *Bowman Transportation, Inc. v. Arkansas-*

---

[19]See also 1 K. Davis, Administrative Law Treatise, sec. 6:13 (2d ed. 1978).

*Best Freight System, Inc.*, 419 U.S. 281 (1974), on remand 399 F. Supp. 157 (W.D. Ark. 1975), affd. 425 U.S. 901 (1976). The "arbitrary and capricious" standard does not require respondent's decision to be supported by substantial evidence, but only that it have a rational basis in the law. *Bowman Transporation, Inc. v. Arkansas-Best Freight System, Inc., supra* at 290; *Hurley v. United States*, 575 F.2d 792 (10th Cir. 1978).

Applying this standard, we do not find on this record that respondent's amendment to the regulation is clearly erroneous or that respondent did not consider the relevant factors offered him by public comment to the proposed changes. We think it is readily apparent that respondent's changes are rational, supportable, and within the parameters of sections 611 and 612. They are therefore not arbitrary and capricious.

We find support for our decision in *American Standard, Inc. v. United States, supra.* At issue, there was the validity of a change in a consolidated return regulation when no statement of basis and purpose accompanied it. The court stated that:

> Unlike some legislative rules that are promulgated pursuant to vague statutory commands and within a vague statutory framework which make review difficult, if not impossible, consolidated return regulations are reviewed in terms of a large, comprehensive code and a sizable body of decisional law. [602 F.2d at 269.]

These factors were then sufficient for the Court to determine that the APA requirement of an accompanying basis and purpose statement was not violated by the omission of the statement.

It follows that those same factors apply to the depletion regulations under part 1 of subchapter I. Natural resources taxation has developed into a highly specialized yet substantial area of the law, with ample precedents to facilitate review.[20]

Since the purpose of APA section 553(c) is to expose the reasons for the rule, we think no statement accompanying the publication of the amendment was required.[21]

---

[20]The regulation itself was originally adopted in T.D. 6446, 1960–1 C.B. 208. Its predecessor was Reg. 101, sec. 29.23(m)-110(C), T.D. 4960, 1940–1 C.B. 38, pursuant to the Internal Revenue Code of 1939.

[21]In addition, regulations are not to be declared void merely because of a technical flaw in failing to include within the rules a statement of their basis and purpose where the rules'

## 4. *Failure to Respond to Comments*

Petitioner also argues that the failure to provide a basis and purpose statement invalidates the amendment because of its relationship to the rights of parties to submit comments. The theory is that the opportunity to comment is rendered meaningless unless the agency responds to significant points raised by the public. See *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35–36 (D.C. Cir. 1977).

We are not certain in this case that respondent's statement in T.D. 7523 that "After consideration of all comments * * * [the] Treasury Decision is adopted" is not a sufficient one. The APA's rationale for requiring a statement is primarily designed for cases where factual findings and considerations constitute the bedrock for the agency's decision. However,

rules may be based on law, on interpretation of a statute, and on policy preferences, and hardly at all on identifiable facts; such rules may clearly be valid without factual support. Tax regulations often call for no factual inquiry beyond common knowledge; * * * factual support for such a regulation is intrinsically unnecessary, for it is a mixture of interpreting the legislative intent and declaring subordinate policy. * * * [1 K. Davis, Administrative Law Treatise, sec. 6:13, at 510 (2d ed. 1978).]

We think the amendment to the regulation required very minimal factual support, if any, to satisfy the APA requirement of a basis and purpose statement. In addition, the Supreme Court has held in another area of the law that where an agency's determinations are primarily of a judgmental or predicative nature,[22] factual support in the record is not possible or required. *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 813–814 (1978). In short, a detailed statement of the reasons for the decision is not required

basis and purpose is obvious from the specific governing legislation. We have just stated that we think the basis and purpose to be obvious. *Nader v. Sawhill*, 514 F.2d 1064 (D.C. Cir. 1975); *Gulf Oil Corp. v. Hickel*, 435 F.2d 440 (D.C. Cir. 1970); *Hoving Corp. v. F.T.C.*, 290 F.2d 803 (2d Cir. 1961). If there has been a violation, we think it of a purely technical nature, and insufficient to warrant the amendment's invalidation. See *Alabama Association of Insurance Agents v. Board of Governors of Federal Reserve System*, 533 F.2d 224, 236–237 (5th Cir. 1976), wherein the reluctance on behalf of courts to strictly enforce the requirement of a basis and purpose statement is discussed.

[22]This would apply to comments received by respondent addressing effects on the apparent "change of policy" contained in the amendment.

because this is a so-called "policy" decision. See *Pickus v. United States Board of Parole*, 507 F.2d 1107, 1113 (D.C. Cir. 1974).

However, if we assume that a basis and purpose statement would be required, an examination of the documents received by the Commissioner during the notice and comment proceedings reveals that changes undoubtedly were made to address some problems or questions contained in some of the comments submitted to respondent. As these suggestions from the public were in fact heeded, it is impossible to say that the right to comment was rendered meaningless.[23] Accordingly, 5 U.S.C. sec. 553(c) was not violated.

## 5. *Additional Comments*

Petitioner strongly argues that the changes between the proposed amendment and the final form of the regulation (see note 7 *supra*) are so substantial as to require a new round of notice and comment hearings because the prior right to comment and the benefit of notice of the proposed rules were then nullified. Petitioner supports his argument by claiming that the regulation as adopted did not result from a "'logical outgrowth' of the hearing and related procedures." See *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1031 (D.C. Cir. 1978); *South Terminal Corp. v. E.P.A.*, 504 F.2d 646 (1st Cir. 1974); *International Harvester Co. v. Ruckelshaus*, 478 F.2d 615 (D.C. Cir. 1973); *American Standard, Inc. v. United States, supra*. We disagree.

The cases cited by petitioner stand more for the proposition that even where the final rule differs significantly from the proposed one "Parties have no right to insist that a rule remain frozen in its vestigial form." *South Terminal Corp. v. E.P.A., supra* at 659. Further,

The requirement of submission of a proposed rule for comment does not automatically generate a new opportunity for comment merely because the

---

[23]Petitioner argues that because none of the comments received advocated amending the regulation at all from the way it read prior to the proposed form, it follows that the comments were not evaluated. This argument misses the mark. The APA does not insure that the consensus view of the public be adopted, but only that the public be given the opportunity to be heard. As to the change from "nontaxable" to "taxable," this is a policy decision, completely within the discretion of the Commissioner, and therefore outside these restrictions of the APA. See text accompanying note 22 *supra*.

rule promulgated by the agency differs from the rule it proposed, partly at least in response to submissions. * * * [*International Harvester Co. v. Ruckelshaus, supra* at 632.]

The appropriate test as to whether a new round of comments is necessary is whether the proposed regulation would fairly apprise interested persons of subjects and issues before the agency. *American Iron & Steel Institute v. E.P.A.*, 568 F.2d 284 (3d Cir. 1977). We think the proposed and final regulations were substantially identical. Cf. *Wendland v. Commissioner*, 79 T.C. 355 (1982). See also P. Maxfield, Taxation of Mining Operations, sec. 3.03[3][2], at 3–31 (1982). The only arguably substantial change regarding petitioner would be the second sentence of the regulation. We think that sentence is sufficiently related to the first sentence as to be merely explanatory in nature. Such a minor change therefore did not require a second round of comment before the regulation could be properly adopted. The remaining changes to the amendment were sufficiently related to the proposed regulation so that an interested party could not help but know the pertinent issues involved.[24]

Accordingly, we hold that the procedure in enacting the amendment to section 1.612–3(b)(3), Income Tax Regs., was in accordance with the provisions of the Administrative Procedure Act.

## B. LEGISLATIVE REENACTMENT DOCTRINE
### AND ABUSE OF DISCRETION

Petitioner also contends that the amendment to the regulation is not valid because the former regulation was tacitly approved by Congress pursuant to the "legislative reenactment" doctrine. See *Helvering v. R. J. Reynolds Tobacco Co.*, 306 U.S. 110 (1939). See also *United States v. Correll*, 389 U.S. 299 (1967). In addition, petitioner contends that making the

---

[24]The holding in *American Standard, Inc. v. United States*, 220 Ct. Cl. 411, 602 F.2d 256 (1979), pertaining to insufficient notice is distinguishable on this point. In that case, the proposed regulation included a particular loss in the computation of taxable income, while the final regulation expressly did not. Such a complete turnaround is substantially different from the generally explanatory changes between the proposed and final forms of sec. 1.612–3(b)(3), Income Tax Regs.

regulation retroactive to October 29, 1976, is an abuse of respondent's discretion under section 7805(b).

These arguments were discussed at length in *Wendland v. Commissioner*, 79 T.C. at 382–385, and that opinion is dispositive of these issues.[25] Petitioner admitted on brief that he was aware of the provisions of the proposed regulation at the time the sublease was executed. Also, petitioner's affidavit filed with the Court states that, for certain purposes, he relied on the amendment when entering into the transaction. In the light of this record, we are firmly convinced that there were no abusive effects resulting from retroactivity of the regulation.

### C. DUE PROCESS

Petitioner also contends that making the regulation retroactive to October 29, 1976, is a violation of due process of law. His argument centers upon the theory that the retroactive effective date of the amendment posits a tax upon a transaction that was not subject to tax at the time of its occurrence. See, e.g., *Welch v. Henry*, 305 U.S. 134, 147 (1938). He further contends that entering into the sublease agreement was purely a voluntary act that he might well have refrained from doing had he known at the time that the transaction would prove to be taxable.

The test in this situation is whether the nature of the tax and the circumstances of its imposition from its retroactive application are so "harsh and oppressive as to transgress the constitutional limitation." *Welch v. Henry*, *supra* at 135; *Buttke v. Commissioner*, 72 T.C. 677, 679 (1979), affd. 625 F.2d 202 (8th Cir. 1980).

Petitioner's contention is without merit. He admits he was well apprised of the proposed change in the regulation. Therefore, there is no basis to his claim that he had no reason to suppose the transaction would be taxed. As such, there was no violation of due process. *Westwick v. Commissioner*, 636 F.2d 291 (10th Cir. 1980), affg. a Memorandum Opinion of this Court; *Cohan v. Commissioner*, 39 F.2d 540, 545 (2d Cir. 1930).

---

[25]We want to elaborate, however, that petitioner's assertion of abuse of discretion is additionally suspect here because the agreement was entered into more than 11 months after publication of the proposed changes to the regulation in the Federal Register. In *Wendland*, the parties entered into the transaction within 8 weeks after publication.

### D. IRS PROCEDURAL RULES

Petitioner's final objection to the validity of the amendment is that it was not promulgated in accordance with respondent's own internal procedural rules and therefore should be of no effect. Specifically, he contends that the IRS Statement of Procedural Rules[26] compels respondent to publish in the Cumulative Bulletin all substantive and procedural rulings of importance or general interest and to announce legislation. This requirement was violated, according to petitioner, because the Commissioner failed to use the bulletin for the announcement of the proposed regulation and the suspension of Rev. Ruls. 70–20 and 74–214.[27] In his opinion, these were rulings of great importance within the meaning of respondent's procedural rule, and the failure of respondent to follow his own rule results in a violation of due process. See *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1969). We do not agree.

We need not pass upon petitioner's claims, as we think his underlying premise is incorrect. Petitioner admits that the failure to follow an internal agency rule is not a violation of due process if the rule is directory rather than mandatory in nature. It is well settled that the IRS Statement of Procedural Rules constitutes rules laid down by respondent for the regulation of the affairs of his own office rather than formal regulations with the force and effect of law. They have no added authority under the APA. *Rosenberg v. Commissioner,* 450 F.2d 529 (10th Cir. 1971); *Cleveland Trust Co. v. United States,* 421 F.2d 475 (6th Cir. 1970); *Geurkink v. United States,* 354 F.2d 629 (7th Cir. 1965); *Luhring v. Glotzbach,* 304 F.2d 560, 565 (4th Cir. 1962). Petitioner's reliance on *United States v. Heffner, supra,* and *United States v. Leahey,* 434 F.2d 7 (1st Cir. 1970), is inappropriate because those cases were concerned with criminal and not civil proceedings. *Rosenberg v. Commissioner, supra* at 532–533. Moreover, the Supreme Court has held evidence obtained in violation of respondent's procedural rules as admissible in a criminal proceeding. *United States v.*

---

[26] 26 C.F.R. sec. 601.601(d).

[27] The *revocation* of Rev. Ruls. 70–20 and 74–214 appeared in the Cumulative Bulletin in Rev. Rul. 77–489. The proposed regulation and the suspension of the rulings were never published in the bulletin.

*Caceres*, 440 U.S. 741 (1979). We conclude that if in fact the rules were violated, petitioner's due process rights have not been infringed.

For the reasons stated above, we hold that the amendment to section 1.612–3(b)(3), Income Tax Regs., was promulgated according to law and in compliance with the provisions of the APA. It is therefore valid.

## *Issue 2. Compliance with Amended Regulation*

The first sentence of amended section 1.612–3(b)(3), Income Tax Regs.,[28] sets forth the general rule that advanced royalties are deductible only in the year the mineral product is sold. Neither party disagrees that petitioner's liability under the agreement constitutes a royalty.[29] However, the regulation allows a current deduction for advanced royalties paid or accrued "as a result of a minimum royalty provision."[30] Petitioner concedes that, if the amendment is valid, no deduction is allowable unless the $60,000 qualifies as a payment made pursuant to a "minimum royalty provision."

A minimum royalty provision is defined in the regulation as follows:

For purposes of this paragraph, a minimum royalty provision *requires that a substantially uniform amount of royalties be paid at least annually* either over the life of the lease or for a period of at least 20 years, in the absence of

---

[28]See note 7 *supra*.

[29]This is to be distinguished from delay rentals, bonus, or production payments. See *McFaddin v. Commissioner*, 2 T.C. 395 (1943); *Kleberg v. Commissioner*, 43 B.T.A. 277 (1941); Rev. Rul. 72–165, 1972–1 C.B. 177. An advance minimum royalty is also referred to as advance royalty because the payor is obligated to pay amounts in advance, subject to the right of recoupment. *McFaddin v. Commissioner, supra.* See generally P. Maxfield, Taxation of Mining Operations, sec. 3.03 (1982).

[30]In mineral law, a "royalty" is defined as a right to minerals in place that entitles its owner to a specified fraction of the total production of the property, free of expenses of development and operation, and extending for the length of the lease. A minimum royalty adds the feature that in no event shall the payments made by the lessee to the lessor in a particular year or years fall below a specified amount. F. Burke & R. Bowhay, Income Taxation of Natural Resources, sec. 2.03 (1982); H. Williams & C. Meyers, Manual of Oil and Gas Terms 432 (5th ed. 1982). The economic purpose for an owner of a mineral interest to require a minimum royalty provision is to provide an impetus for the lessee to begin production as quickly as possible so as to recoup those amounts paid in advance of production. Inherent in the definition of an advance minimum royalty, as reflected in the language of the regulation, is the concept that there must exist an enforceable requirement that payment be made.

mineral production requiring payment of aggregate royalties in a greater amount. [Emphasis supplied.]

Petitioner contends that the sublease agreement requires that a substantially uniform amount ($6,000 per year for 10 years) of royalties be paid over the life of the lease. He therefore claims the payments were made as a result of a minimum royalty provision and consequently are fully deductible in 1977. To the contrary, respondent contends that there was no requirement for the payment of any royalties to be made on at least an annual basis since under the terms of the note all principal and interest do not become due from petitioner until December 31, 1987. We agree with the respondent.

We reject petitioner's argument that a minimum royalty provision was purportedly created by one sentence of the sublease agreement.[31] Even assuming that the 10-year primary term is the appropriate reference period,[32] and the $6,000 per year is a substantially uniform amount, we still think that the scheduled payments under the lease agreement do not qualify for such treatment.

Contrary to petitioner's claim, we must look to the agreement *as a whole*, along with any pertinent additional information, to determine if the requirements for establishing a minimum royalty provision have been met. Looking at the entire agreement, we find one sentence which requires an annual minimum amount to be paid uniformly over the life of the lease. However, that sentence is immediately contradicted or undone by the following subsequent sentences:

The advance minimum Annual Royalty payment herein provided for shall be recoupable at the rate of $.50 per ton of coal sold or mined, removed and marketed. The *minimum annual advance Royalty shall be paid with $10,000*

---

[31]The record is not clear, but it appears that the interest attempted to be created should be characterized as an *overriding* minimum royalty. However, if such is the case, treatment under the regulation is the same as that of a minimum royalty. *Kiesau Petroleum Corp. v. Commissioner*, 42 B.T.A. 69, 75 (1940); *Aven v. United States*, an unreported case (W.D. Okla. 1978, 42 AFTR2d 78–6120, 78–2 USTC par. 9729).

[32]We note that the lease agreement provides for a period of extension. See note 5 *supra*. In such situations, the regulation states that those extension periods are to be included as part of the term of the original lease. However, because we have chosen to base our decision on different grounds, we need not address this issue.

*cash upon execution of this sublease and the delivery of the Lessee's nonrecourse promissory note of $50,000.* [Emphasis supplied.]

Under the terms of the nonrecourse note, none of the note principal is required to be paid until December 31, 1987. See note 5 *supra*. The primary term of the lease ends October 8, 1987. Thus, the lease, when read in conjunction with the note, indicates that the royalty is *not* required to be paid $6,000 per year for the 10-year life of the lease, but will only be paid, *if at all*, in 1987 (i.e., when the note comes due). As a result, petitioner is only obligated to pay $10,000 cash in the first year and possibly $50,000 at the end of the lease term. It is obvious that this falls outside the language of the regulation, which "requires a substantially uniform amount of royalties be paid at least annually * * * over the life of the lease."

A close examination of the lease agreement and the note indicates that there is no *requirement* that the payment of $6,000 per year be made for the life of the lease. The documents state that the due date for payment of the note principal extends beyond the primary term of the lease. Accordingly, the lease is scheduled to terminate prior to any payment of royalties represented by the note, absent production. At the time the note comes due, the lease securing the note will already have terminated and hence, be valueless. Because this is a nonrecourse obligation and the underlying security for payment would then be zero, there would be no incentive for petitioner to pay anything. In short, whether any funds are required to change hands is wholly contingent on petitioner's mining the coal, for which there is no incentive to do so other than that normally provided through a simple royalty (in excess of the $10,000 cash already paid). Because payment is contingent, it cannot be said that there is a *requirement* that the set amount be paid.

Petitioner contends, however, that since the note is collateralized by sufficient reserves, as stipulated by the parties, the note will in fact be paid—either in cash or through the loss of valuable property (the coal reserves) upon foreclosure of the lease. Again, this argument misses the mark. To qualify for the deduction, the petitioner must meet the terms of the regulation, which sets out that a minimum royalty provision must *require* payment at least annually. That the note may in

fact be paid at some later date is not sufficient to establish the existence of such a requirement.[33]

Moreover, we disagree with petitioner's basic contention. We have already stated our reasons for doubting that the note will ever be paid in cash.[34] As to the other method of satisfying the note, we likewise see no relevance in looking to the value of the *coal reserves* to determine if the note is to be paid because the asset securing the note is the *lease* (which will have terminated), not the reserves. It is also irrelevant that the project may mine the property during the 10-year primary lease term, and therefore, make payment on the note. The regulation demands that the provision *require* a substantially uniform amount be paid at least annually. As illustrated above, there is no such requirement on the facts of this case.[35]

Petitioner further argues that all the regulation requires is that the amounts be paid *"as a result of* a minimum royalty provision."* (Emphasis supplied.) He asserts that since the liabilities arose *as a result of* this provision, we need not examine *how* the payment is to be made. We do not agree. Such an interpretation would be an overly strict and contradictory reading of the regulation. If we accepted petitioner's argument, the regulation could be satisfied merely by parroting the necessary language and then structuring the obligations and payments whichever way suited the parties. To accept petitioner's claim would be contrary to the clear meaning of the regulation, which is to allow current deductions for advance minimum royalties that are required to be .

---

[33]We note that if the agreement had a provision stating only that royalties would be paid $6,000 per year for the life of the lease, then each year the lessee is forced to pay or else face forfeiture of the mineral interest security. In the present case, there is no such requirement, at least until the year 1987.

[34]We also note that as the transaction now stands (and if we accepted petitioner's claims), the total payment required by him would be the initial $10,000, even if petitioner never mined any coal. The corresponding deduction for the total outflow of the $10,000, however, would total $60,000.

[35]We note that petitioner's structuring of payments followed by the giving of the note is a further indication that there is no requirement to pay a substantially uniform amount at least annually. See note 33 *supra*. We can discern no reason for petitioner's stating that $6,000 is to be paid each year for the life of the lease and then give a note due in the 10th year for those same amounts other than that petitioner did not want to be liable for payment during the term of the lease. Without such liability, there can be no enforceable requirement to pay, and hence, no minimum royalty provision.

paid regardless of production, and which are properly allocable to that year.[36]

Our last consideration is whether petitioner is entitled to any deduction in 1977 for the $10,000 cash portion of his payment. Since no valid minimum royalty provision existed, the $10,000 represents merely a cash advance royalty and is therefore subject to the general rule of the regulation. That general rule requires that coal be sold (or produced) before any portion of the advance royalty is deductible. Accordingly, none of the cash is deductible in 1977 because no coal was sold or produced from the mine in that year.[37]

To give effect to concessions of the parties and to the conclusions reached herein,

*Decision will be entered under Rule 155.*

---

[36]We do not, however, make any statement regarding the deductibility of lump-sum advance minimum royalties. Compare Rev. Rul. 77–489, 1977–2 C.B. 177, and Rev. Rul. 80–70, 1980–1 C.B. 104.

[37]Since no coal was sold in 1976, it is unnecessary for us to decide whether the giving of the $50,000 note would qualify as an advance royalty. However, see and compare Rev. Rul. 80–73, 1980–1 C.B. 128.