AGUSTIN TORUNO and ANGELA TORUNO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Toruno v. Commissioner
Docket No. 11018-81.
United States Tax Court
T.C. Memo 1988-92; 1988 Tax Ct. Memo LEXIS 119; 55 T.C.M. (CCH) 296; T.C.M. (RIA) 88092; March 1, 1988. Agustin and Angela Toruno, pro se. Linda J. Wise, for the respondent. COUVILLION
MEMORANDUM OPINION COUVILLION, Special Trial Judge: This case was considered pursuant to the provisions of section 7456(d) (redesignated as section 7443A(b) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rule 180 et seq. [1]
Respondent determined deficiencies in petitioners' Federal income taxes in the amounts *120 of $ 31,099 and $ 25,145, respectively, for 1977 and 1978. Before the Court is a motion by respondent for partial summary judgment under Rule 121. At issue is whether petitioners are entitled to deductions attributable to a minimum annual royalty by a partnership, Tennessee Partners, Ltd. (TPL) in which petitioners had an interest. [2]
Petitioners were residents of Miami, Florida, at the time they filed their petition. Agustin Toruno (petitioner) was admitted into TPL as a limited partner on or about December 16, 1977. On December 28, 1977, TPL entered into a sublease (lease) to mine and market, as sublessee, all of the mineable and merchantable coal underlying some 28,600 acres of land in Hamilton and Bledsoe *121 Counties, Tennessee. The sublease was for a primary term of 20 years, unless in the sole judgment of TPL the economically recoverable coal was exhausted sooner, in which event the lease was terminable. The lease could be extended beyond 20 years, on a year-to-year basis, at TPL's election, until such time as all merchantable coal had been extracted from the properties. TPL was required to pay a production royalty each year in the lesser amount of eight percent (8%) of the gross sales price of coal mined from the premises, or $ 2.40 per ton. However, regardless of production, TPL was required to pay annual advanced royalties, subject to recoupment out of production, of $ 7,680,000 each year. This advanced royalty obligation was discharged by the payment of cash and execution of promissory notes as follows: For each of the first three years, cash of $ 900,000 and a recourse (personal liability) note of $ 6,780,000, and for the fourth through twentieth years, a nonrecourse note of $ 7,680,000 each year. [3]
*122 The three recourse notes were payable 20 years after date, subject to prior production and other cash payments. The production payments were the lesser of $ 2.40 per ton or eight percent (8%) of the gross sales price of coal mined and sold from the leased properties. The notes could be extended, at TPL's option, for an additional 10 years, or for such additional time as the primary term of the coal lease was extended. In addition, beginning January 1, 1980, the maker was obligated to make cash principal payment son each note of $ 25,000 per month, or $ 300,000 per year. However, the cash payment obligation and the production payments were not due on any individual note until such time as all earlier executed notes had been paid in full. Additionally, the cash payment obligation was subject to a credit for all payments on the notes arising out of production. The nonrecourse notes (for the fourth through twentieth years) were payable 20 years after date, with prior payments due "after satisfaction of all earlier dated promissory notes * * * and the recoupment by the maker of all cash advance royalties paid * * * pursuant to the Lease * * *, [and] subject to prior principal *123 payments in the * * * lesser of $ 2.40 per ton * * * or 8% * * * of the gross sales price for each ton of coal mined and sold from the Coal Properties * * *." The notes could also be extended by TPL in the same manner as the recourse notes. All of the notes bore interest at six percent per annum; however, interest accrued only when certain levels of coal production were reached. [4] The notes were secured by the coal reserves underlying the leased properties. As a condition of his admission as a limited partner in TPL, petitioner was required, as part of his capital contribution, (as were all limited partners) *124 to assume personal liability for his ratable share of the three recourse notes of $ 6,780,000 executed by TPL to its lessors under the lease. On the partnership information returns for 1977 and 1978, TPL deducted $ 7,680,000 each year for advance minimum royalties, consisting of the $ 900,000 cash and the $ 6,780,000 promissory notes for each year. These amounts were disallowed by respondent for the reason that the amounts claimed did not constitute deductible advanced royalties within the minimum royalty provision envisioned by section 1.612-3(b)(3), Income Tax Regs.[5]
Under Rule 121, summary judgment may be granted "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b). Partial summary judgment may also be granted. Rule 121(b). The moving party bears the burden of proving there is no genuine issue of material fact. Jacklin v. Commissioner,79 T.C. 340, 344 (1982); *125 Espinoza v. Commissioner,78 T.C. 412, 416 (1982). The party opposing a properly supported motion cannot rest upon the mere allegations or denials in his pleadings, but must "set forth specific facts showing that there is a genuine issue for trial." Rule 121(d). The standard for granting a motion for summary judgment requires that there be no genuine issue of material fact. A material fact is one that is both relevant to an element of a claim or defense and that might affect the outcome of a lawsuit. The substantive law governing a claim or defense determines the materiality of a fact. Entry of summary judgment is not precluded by disputes over irrelevant or immaterial facts. Anderson v. Liberty Lobby, Inc.,477 U.S. 242, 106 S.Ct. 2505, 2510 (1986); T. W. Elec. Service v. Pacific Elec. Contractors,809 F.2d 626, 67730 (9th Cir. 1987). In determining if a genuine issue of material fact exists, all facts and inferences must be viewed in the light most favorable to the party opposing the motion. Anderson v. Liberty Lobby, Inc.,106 S.Ct. at 2513; Jacklin v. Commissioner, supra at 344; Espinoza v. Commissioner, supra at 416. *126 A genuine dispute over a material fact precluding the grant of summary judgment exists "if the evidence is such that a * * * [judge or] jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., supra at 2510. Summary judgment may be granted if the nonmoving party's evidence is "merely colorable * * * or is not significantly probative." Anderson v. Liberty Lobby, Inc., supra at 2511 (citations omitted). Section 1.612-3(b)(3), Income Tax Regs., sets forth the rules for deductibility of advance royalties. Generally, an advance royalty is deductible only in the year the mineral product, for which the royalty is paid, is sold. Section 1.612-3(b)(3), Income Tax Regs. When the advance royalty is paid or accrued "as a result of a minimum royalty provision," an exception to the general rule is provided by the regulation and the advance royalty may be deducted in the year the royalty is paid or accrued even though no mineral product has been sold. Section 1.612-3(b)(3), Income Tax Regs.
For purposes of the regulation, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least *127 annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. * * *
Section 1.612-3(b)(3), Income Tax Regs. The regulation is valid. Redhouse v. Commissioner,728 F.2d 1249 (9th Cir. 1984), affg. 79 T.C. 355 (1982), cert. denied 469 U.S. 1034 (1984); Wing v. Commissioner,81 T.C. 17 (1983). To the extent, therefore, that no coal was sold during the years in question, the royalties for these years are deductible only if they were paid pursuant to a minimum royalty provision within the meaning of section 1.612-3(b)(3), Income Tax Regs.[6]
*128 A valid minimum royalty provision must contain a requirement that a substantially uniform amount of royalties be paid at least annually over the term of the lease, or for a period of at least 20 years, to satisfy the regulation. Capek v. Commissioner,86 T.C. 14, 41 (1986); Vastola v. Commissioner,84 T.C. 969 (1985); Wing v. Commissioner, supra. A minimum royalty provision does not satisfy the regulation if the provision permits the deferral of royalty payments. There must be an enforceable obligation to make a royalty payment each year. Oneal v. Commissioner,84 T.C. 1235, 1241 (1985); Vastola v. Commissioner, supra at 975-976; Wing v. Commissioner, supra at 38 n.30. This Court has previously determined in several cases what constitutes a "minimum royalty provision" under section 1.612-3(b)(3), Income Tax Regs. See, e.g., Capek v. Commissioner, supra;Wing v. Commissioner, supra. In Capek, it was held that, in order to qualify as a minimum royalty under section 1.612-3(b)(3), Income Tax Regs., the lease must require the payment of a substantially *129 uniform amount of royalties at least annually. 86 T.C. at 41. In other words, the lease cannot permit the deferral of payment of the minimum annual royalty. There must be an enforceable obligation to make a substantially uniform payment each year. Oneal v. Commissioner, supra at 41. The fact that the value of the property securing payment of the notes is sufficient to assure the ultimate payment of the notes is irrelevant under section 1.612-3(b)(3), Income Tax Regs.Capek v. Commissioner, supra;Vastola v. Commissioner, supra;Wing v. Commissioner, supra.
In light of these pronouncements, two considerations stand out in the evaluation of respondent's motion: Were the advanced royalty obligations by TPL "substantially uniform" and, if so, were such obligations "paid at least annually?" Addressing the first of these considerations, the Court notes that, for the term of the lease, three notes were "recourse" obligations, while the remaining 17 notes were "nonrecourse" obligations. While this fact alone may not be sufficient to conclude that the total royalty obligations were not "substantially uniform," there are other *130 more significant facts from which a conclusion can be reached on this question: (1) The first three annual royalty obligations required payments of $ 900,000 cash each year while no cash payments were required in the ensuing 17 years. (2) As a result of the $ 900,000 cash payments for the first three years, the principal amounts of the notes for the first three years differed from the principal amount of the notes for the ensuing 17 years. (3) The commencement date for the accrual of interest between the "recourse" notes differed, and the commencement date for the accrual of interest on the 17 notes differed from the commencement date of the "recourse" notes. (4) Cash principal payments of $ 25,000 per month were required on the "recourse" notes, while there was no similar requirement on the "nonrecourse" notes. (5) The $ 25,000 monthly cash payments were not to commence until January 1, 1980. Thus, no cash payments were required for 1977, 1978, and 1979. (6) The casn payment of $ 25,000 per month on any note was not required "until the maker has paid in full any earlier dated notes." Thus, so long as there was a balance due on the first note, cash payments on the *131 second and third notes were not required.
From these facts, the Court concludes, and finds, that the annual royalty obligations of TPL were not "substantially uniform." While resolution of this first factor might well conclude the consideration of this case, the Court, nevertheless, passes upon the other question noted above, whether the annual royalty obligations were "paid at least annually." The following facts are noted as to this question: (1) With respect to the cash principal payments of $ 25,000 each month on the recourse notes, there was no provision in the notes allowing the holder to accelerate the notes in the event of default of this monthly obligation. In effect, therefore, payment of the note or notes could not be enforced by the holder if these monthly payments were not made. (2) The $ 25,000 cash payments were to be credited or, in other words, were not required to the extent payments were made from the production and sale of coal. (3) All other payment obligations on the recourse and nonrecourse notes were not required until all earlier executed notes had been paid in full.
From the above, the Court concludes, and finds, that the royalty obligations of *132 TPL were not "paid at least annually." In effect, payment of the notes was contingent and deferred to the production and sale of coal. Thus, in the absence of production, there was no requirement for an "annual" payment. [7] The regulations in question and the judicial interpretations thereof require that payments must not be contingent, but rather must be independent of sales of the mineral involved and, moreover, such payments must be made annually. *133 Therefore, with respect to the losses claimed by petitioners on their 1977 and 1978 returns from TPL, such losses are not allowed to be extent such losses are attributable to advanced mineral royalty obligations of TPL under section 1.612-3(b)(3), Income Tax Regs. We find no genuine issue of material fact on this question. Respondent's motion for partial summary judgment is granted. To the extent coal was mined and sold during 1977 and 1978, petitioners may be entitled to their ratable share of the partnership's allowable deduction of royalties attributable to minerals (coal) actually sold. This opinion does not address that question as the same will be determined on trial of this case on its merits. This opinion is limited to the question whether the royalty obligations at issue qualified under a minimum royalty provision as envisioned by section 1.612-3(b)(3), Income Tax Regs., and, to that extent, it is the Court's finding and ruling that such obligations do not qualify. To reflect the foregoing, An appropriate order will be issued.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. No adjustments other than the TPL loss were made for the 1978 tax year. For 1977, respondent, in addition to the TPL loss, disallowed a loss of $ 7,652 claimed by petitioners from West Virginia Coal Holdings Partnership and disallowed certain Schedule A deductions. The parties have settled the West Virginia Coal Holdings adjustment, but the Schedule A deductions remain at issue. The motion herein addresses only the TPL adjustment for the two years in question. ↩
3. As to the $ 900,000 cash required for the first year, TPL was allowed to execute a demand note due on the earlier of demand or 15 days after date. For purposes of the motion for partial summary judgment, respondent agrees the three annual cash payments of $ 900,000 cash were made; that all promissory notes were executed by TPL; and that the first three notes were full recourse obligations. ↩
4. For the first recourse note, interest commenced when 30,000 tons of coal per months were produced for three consecutive months; for the second note when 60,000 tons of coal were produced for three consecutive months; and for the third note when 90,000 tons were produced for three consecutive months. For the nonrecourse notes, interest commenced from the date the "Wilder seam" of coal underlying the property was mined. All notes provided that, if total coal production failed to reach certain levels in any year, the interest accrued for such year was reduced pro-rata. ↩
5. Other items of income and expense were reported by TPL; however, those items are not before the Court in this motion. ↩
6. For 1977, TPL reported no gross income, consequently, the Court assumes no coal was sold in 1977. For 1978, TPL reported gross sales of $ 54,672.23, which the Court assumes, for purposes of the motion, included sale of coal. The effect which such sales may have had on petitioners' entitlement to a deduction for 1978 is addressed in the latter part of this opinion. This opinion addresses solely the question whether the advanced royalties qualified as deductible advance minimum royalties under section 1.612-3(b)(3), Income Tax Regs.↩, to the extent such royalties exceeded the amount of coal sold. 7. We note that, since the notes for the years involved in this case were "recourse" and, therefore petitioner was personally liable for TPL's obligation on these notes, this Court, in Heitzman v. Commissioner,T.C. Memo. 1987-109, rejected the argument that assumption of a personal libility or execution of a recourse note, payable after the end of the year in question, complied with the requirements of section 1.612-3(b)(3), Income Tax Regs.: In reaching our conclusion we have considered but cannot adopt petitioners' argument that since the Stonehurst partners were personally liable for the minimum royalties, the sublease in effect provided for guaranteed minimum royalties and thus satisfied the regulation. In support of this contention, petitioners point to Vastola, where we noted by way of dictum that an accrual basis taxpayer could make a strong argument that the regulation should be interpreted to include a provision requiring the payment of royalties with the execution of recourse promissory notes. 84 T.C. at 979. However, any weight attributable to this dictum was removed by our subsequent decision in Capek, where the provision at issue permitted the payment of the minimum royalty with a recourse note payable after the end of the taxable year. Applying the same principles discussed above, we concluded that "Even assuming that petitioners would eventually pay the notes, payment after the close of the taxable year does not satisfy the requirement of the regulation that the royalties be paid at least annually over the term of the lease." 86 T.C. at 47. [53 T.C.M 241↩, 245, 56 P-H Memo T.C. par. 87,109 at 87-566.]