JAMES MADDRIX AND ALICE MADDRIX, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10979–81.    Filed October 22, 1984.

*Elliot I. Miller* and *Richard S. Kastenbaum*, for the petitioners.

*Theodore J. Kletnick* and *Kendall C. Jones*, for the respondent.

### OPINION

STERRETT, *Judge*: In a notice of deficiency dated March 9, 1981, respondent determined a deficiency of $67,900.51 in petitioners' 1977 Federal income tax.

Respondent has filed a motion for partial summary judgment pursuant to Rule 121, Tax Court Rules of Practice and Procedure.[1] The issues raised in respondent's motion are (1) whether certain amounts paid[2] by petitioners in 1977 in the form of cash plus a nonrecourse promissory note constitute "advanced minimum royalties" within the meaning of section 1.612–3(b)(3), Income Tax Regs.; and (2) if so, whether petitioners may deduct in 1977 the entire claimed prepaid advanced minimum royalties, or whether they may only deduct that portion of the claimed advanced minimum royalties that is properly allocable to 1977.

At the time they filed their petition in this case, James Maddrix and Alice Maddrix, husband and wife, resided at 3619 Royal Tern Circle, Quail Ridge, Boynton Beach, FL. Petitioners filed a joint Federal income tax return for the taxable year 1977 with the Internal Revenue Service Center, Chamblee, GA. The amounts here in dispute relate to the activities of James Maddrix, and Alice Maddrix is a party to this litigation only because she filed a joint return with her husband. When

---

[1] All Rule references herein are to the Tax Court Rules of Practice and Procedure.

[2] The use of the terms "paid" or "payment" herein is for convenience only and is not intended to represent any conclusion concerning the true nature of the transaction at issue.

used hereinafter in the singular, "petitioner" will refer to James Maddrix.

Petitioner is an owner of an undivided working interest in a mineral investment program known as Investors Mining Program 77–2 (Investors Mining), which was formed in September 1977 for the stated purpose of developing and mining certain coal-bearing land.[3] Investors Mining was purportedly organized as a West Virginia partnership. The partnership filed an election under section 761(a)(2), I.R.C. 1954, to be excluded from the effects of the subchapter K partnership provisions.

In September 1977, Investors Mining entered into a coal sublease with Olentangy Resources, Inc. (Olentangy), which provided Investors Mining with various rights to mine the coal reserves on the property subject to the lease. This property consisted of approximately 236 acres of land in Logan County, WV. Prior to the time that Investors Mining entered the sublease, a mining engineering company, Banks Engineering Co., Inc., had prepared a coal evaluation report indicating that the tract contained 2,230,173 tons of recoverable coal. The sublease between Olentangy and Investors Mining was for a term of 10 years or until the coal reserves were exhausted.

The sublease agreement contained the following provision calling for an "annual minimum royalty":

*Annual Minimum Royalty.* Sub-Lessees [co-owners of Investors Mining] covenant and agree to pay to Sub-Lessor [Olentangy], during the term of this Sub-Lease, an annual minimum royalty for all coal extracted under the Master Lease in the amount of Three Hundred Thousand Dollars ($300,000) which shall be paid on December 1 for each year for the Lease Year which commences on that date * * *; provided, however, upon commencement of this Sub-Lease, the Sub-Lessees shall pay to the Sub-Lessor the sum of Two Million Five Hundred Forty Thousand Dollars ($2,540,000) of which Five Hundred Ninety Thousand Dollars ($590,000) will be in cash and One Million Nine Hundred and Fifty Thousand Dollars ($1,950,000) will be represented by the execution and delivery to the Sub-Lessor of non-negotiable, non-recourse promissory notes, payable to the Sub-Lessor in the original aggregate principal amount of One Million Nine Hundred and Fifty Thousand Dollars ($1,950,000), and bearing interest at six percent (6%) per annum payable in quarterly installments of $81,196 beginning March 31, 1978, and ending June 30, 1985. These payments shall hereinafter be

---

[3]Investors Mining Program 77–2 was one of several programs, known as Investors Mining Programs 77–1 through 77–5.

referred to as "SUBSEQUENT ANNUAL MINIMUM ROYALTY PAY-MENTS." The Five Hundred Ninety Thousand Dollars ($590,000) payment shall be referred to hereinafter as the "INITIAL ANNUAL MINIMUM ROYALTY."

The sublease agreement also obligated the sublessees to pay a "Tonnage Royalty" in respect of coal mined and removed from the property at the rate of $3 per ton. The agreement provided that the sublessees could recoup the "Initial Minimum Royalty" against the "Tonnage Royalty" at the rate of $3 per ton for 845,667 tons extracted. It further provided that "Subsequent Annual Minimum Royalty Payments" were to be paid at the rate of $3 per ton at the time coal was extracted subsequent to the delivery of the "Subsequent Annual Minimum Royalty Payments."

According to the terms of the sublease agreement, the sublessor would not initiate or pursue any legal or equitable action, including any attempt to obtain money, damage, or deficiency judgments, against any of the sublessees on account of any obligation of the sublessees, it being agreed that only the sublessees' interests in the sublease would be subject to execution, attachment, or any other claim or proceeding on account of any obligation of the sublessees.

Pursuant to the agreement's provision calling for an "annual minimum royalty," each investor in Investors Mining contributed cash and executed a nonrecourse note. Petitioner allegedly contributed $31,230 cash and executed a $103,239 nonrecourse note in 1977 as his share of the "annual minimum royalty." As contemplated in the sublease agreement, the note provided for the payment of interest on the unpaid balance at the rate of 6 percent per annum and further provided that the principal and accrued interest were to be paid quarterly, beginning March 31, 1978, and ending June 30, 1985. Any unpaid principal or interest was fully due and payable on June 30, 1985, or the earlier termination of the borrower's fractional undivided interest. The terms of the note provided that, if the borrower were to default on any payment on the note for a period of 24 months, and such default was not remedied within 3 months after written notice to the borrower, or in the event of any other event of default under the sublease, the lender could declare the entire unpaid principal and accrued and unpaid interest immediately due. Finally, the note specifically

provided that it was without recourse and that the borrower was not personally liable for any amounts payable under the note. The lender agreed to look only to the collateral described in the sublease for payment of the note, that is, the borrower's fractional undivided interest in the sublease.

Simultaneously with the execution of the mineral sublease, Investors Mining entered into a mining services contract with a corporation known as Big Sandy Creek Mining Co., Inc. (Big Sandy Creek). Big Sandy Creek was an affiliate of Olentangy, the sublessor. Both Big Sandy Creek and Olentangy were owned by Jeff E. Miller, Timothy P. Kenny, Larry Huffman, and William H. Martin. Miller also served as the president of Olentangy. Under the terms of the mining services contract, Big Sandy Creek agreed to mine no less than 100,000 tons of merchantable coal during each year of the agreement. It further agreed as follows:

> It is understood that in the event that Contractor [Big Sandy Creek] shall default in the performance of minimum delivery obligations hereto, damages would be difficult to determine. Accordingly, Contractor agrees that its failure to deliver the minimum tonnage set forth above in any year [sic], it shall promptly pay to the Coal Program liquidated damages in an amount equal to $3.00 per ton multiplied by the difference between the minimum deliveries required for such year and the actual delivery made in such year (the "Deficiency") which sum shall be applied toward the principal and interest payments due by the Co-owners of the Program on the Notes issued by the Co-owners pursuant to the Lease with Olentangy Resources, Inc.
> * * *
> In order to secure the payment of the Deficiency, the Contractor agrees to loan to each Co-owner funds sufficient to make all required principal and interest payments under such Co-owner's Notes. In lieu of advancing cash, the Contractor may issue its own promissory notes to the Lessor under the Lease provided that the Lessor accepts the same on a dollar for dollar basis as being equivalent to a cash payment under the Notes.

A subsequent modification to the mining services contract provided, in part:

> *Method of Paying Liquidated Damages.* Any payments which may be required to be made by the Contractor under this Agreement to the Sub-Lessees may be made at the sole election and discretion of the Contractor either in cash or in non-interest bearing, negotiable promissory notes, payable to the Sub-Lessor (Olentangy Resources, Inc.). By execution of this Agreement, the Sub-Lessor agrees to accept from the Sub-Lessees, without recourse, any 'promissory notes received by the Sub-Lessees from the Contractor pursuant to this Agreement and the Sub-Lessor shall apply such

promissory notes as credits against the Sub-Lessees' obligations to pay the Subsequent Minimum Annual Royalty payments as required by the Sub-Lease.

The mining services contract, unless otherwise terminated by the sublessees or Big Sandy Creek, was to remain in force for an initial period of 8 years and, thereafter, Big Sandy Creek had the option to renew for three additional periods of 5 years or until all coal had been removed from the property.

During 1977, no coal was mined by Investors Mining.[4]

Petitioner elected to be taxed on the accrual method of accounting with respect to his proportionate share of items of income, gain, loss, deductions, and credits arising from his investment in Investors Mining. On their joint return for 1977, petitioners claimed a business loss of $142,387 attributable to participation in Investors Mining. The $142,387 loss was comprised of "advance mining royalties" expenses in the amount of $134,471[5] and miscellaneous fees and interest in the amount of $7,916. Respondent disallowed the deductions in their entirety. For purposes of ruling on respondent's motion herein, we are concerned solely with the $134,471 deduction for "advance mining royalties."

Rule 121(b) provides that a decision may be rendered upon motion for summary judgment if it is shown "that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law," and that "partial summary adjudication may be made which does not dispose of all the issues in the case." The factual materials presented and the inferences to be drawn from such materials "must be viewed in the light most favorable to the party opposing the motion." *Jacklin v. Commissioner*, 79 T.C. 340, 344 (1982), and cases cited therein. For purposes of his motion for partial summary judgment, respondent accepts the form of the transaction in question at face value; therefore, we do the same. Cf. *Jacklin v. Commissioner, supra* at 345.

---

[4]According to petitioner, approximately 100,000 tons of coal eventually were mined by the various Investors Mining programs, of which approximately 20,000 tons were mined and sold by Investors Mining Program 77–2. Further mining was terminated when the customer purchasing the coal terminated its purchases and other satisfactory customers could not be found.

[5]We note a $2 discrepancy between the amount of "advance mining royalties" allegedly paid ($31,230 in cash and $103,239 by execution of the nonrecourse note) and the $134,471 amount claimed on the return.

Respondent, relying on section 1.612–3(b)(3), Income Tax Regs., contends that the royalties paid in 1977 are not deductible in that year as a matter of law. The regulation states in relevant part:

The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. For purposes of the preceding sentence, in the case of mineral sold before production the mineral product is considered to be sold when the mineral is produced (i.e., when a mineral product first exists). However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. See section 446 (relating to general rule for methods of accounting) and the regulations thereunder. For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. For purposes of the preceding sentence, in the case of a lease which is subject to renewal or extension, the period for which it can be renewed or extended shall be treated as part of the term of the original lease. * * * Every taxpayer who pays or accrues advanced royalties resulting from a minimum royalty provision must make an election as to the treatment of all such advanced royalties in his return for the first taxable year ending after December 31, 1939, in which the advanced royalties are paid or accrued. The taxpayer's treatment of the advanced royalties for the first year shall be deemed to be the exercise of the election. Accordingly, a failure to deduct the advanced royalties for that year will constitute an election to have all the advanced royalties treated as deductions for the year of the sale of the mineral product in respect of which the advanced royalties are paid or accrued. See section 7807(b)(2). * * * The provisions of this subparagraph do not allow as deductions from gross income amounts disallowed as deductions under other provisions of the Code, such as section 461 (relating to general rule for taxable year of deduction), section 465 (relating to deductions limited to amount at risk in case of certain activities), or section 704(d) (relating to limitation on allowance to partners of partnership losses).

According to respondent, as a definitional matter, the royalties paid in 1977 were not "advanced minimum royalties" within the meaning of the foregoing section of the regulations. Such being the case, since no coal was produced or sold in 1977, respondent asserts that petitioner is not entitled to deduct the royalties paid in that year. Alternatively, respondent asserts that, should this Court determine that the

royalties were "advanced minimum royalties," then petitioner is entitled to deduct only that portion of the royalties that is properly allocable to the year in issue. Cf. Rev. Rul. 77–489, 1977–2 C.B. 177; Rev. Rul. 80–70, 1980–1 C.B. 104. Because we agree with respondent that the royalties paid in 1977 do not qualify as "advanced minimum royalties" and that petitioner is entitled to no deduction with respect to those royalties in that year, we will not herein address respondent's alternative assertion.

In general, advanced royalties are deductible only in the year that the mineral product, in respect of which the advanced royalties were paid, is sold. However, the regulation recognizes an exception in the case of advanced royalties paid or accrued "as a result of a minimum royalty provision." Under the exception, advanced minimum royalties may, at the option of the payor, be deducted in the year that they are paid or accrued.

Neither party disputes that petitioner's liability under the sublease agreement constitutes a liability to pay royalties. Furthermore, petitioner does not appear to dispute that he is entitled to no deduction in 1977 since no coal was sold in that year, unless the claimed $134,471 payment qualifies as a payment made pursuant to a "minimum royalty provision."

Under section 1.612–3(b)(3), Income Tax Regs., a "minimum royalty provision" is a provision that "requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount."

In *Wing v. Commissioner*, 81 T.C. 17 (1983), we explored the parameters of the regulatory definition of a "minimum royalty provision." There, an accrual-basis taxpayer entered into a 10-year sublease of certain Wyoming coal leases on October 8, 1977, obligating himself to pay an "advance minimum Annual Royalty of $60,000 ($6,000 for each of the first ten years of the sublease)." (81 T.C. at 21 n. 5.) However, the sublease provided that this royalty was to be paid, upon the execution of the agreement, in the form of $10,000 cash and a $50,000 nonrecourse promissory note. The note, which bore interest of 7 percent per year, was secured by the lease and was to be paid from proceeds received on coal sales at the rate of $0.50 per ton

sold. All payments were to apply to interest first, and the balance, if any, was to be applied to reduction of principal. All outstanding sums were due and payable on December 31, 1987. The taxpayer, relying on section 1.612–3(b)(3), Income Tax Regs., claimed the full $60,000 as a deduction in 1977.

Under the foregoing facts, respondent argued in *Wing* that there was no requirement for the payment of any royalties to be made on at least an annual basis since under the terms of the note all principal and interest did not become due from the taxpayer until December 31, 1987. We agreed with respondent that, viewing the arrangement as a whole, there was no requirement that royalties of a substantially uniform amount be paid annually over the life of the lease. In so concluding we noted, inter alia, that payment on the note was wholly contingent on the taxpayer's mining the coal. Because payment was contingent, it could not be said that there was a *requirement* that the set amount be paid. Hence, we stated that to hold for the taxpayer under the facts presented in *Wing* "would be contrary to the clear meaning of the regulation, which is to allow current deductions for advance minimum royalties that are required to be paid regardless of production, and which are properly allocable to that year." (81 T.C. at 41–42.)[6]

In the instant case, Investors Mining obligated itself to pay "an annual minimum royalty for all coal extracted * * * in the amount of Three Hundred Thousand Dollars ($300,000) * * * [to] be paid on December 1 for each year" of the lease. However, the sublease provided that $2,540,000 of this royalty was to be paid upon commencement of the sublease, in the form of $590,000 cash and a $1,950,000 nonrecourse note. Petitioner, in turn, obligated himself, upon commencement of the sublease, to pay $31,230 in cash and to execute a $103,239 nonrecourse note as his share of the purported annual minimum royalty. The note signed by petitioner clearly specified that it was secured solely by petitioner's fractional undivided interest in the sublease, that petitioner would not be personally liable for any amounts payable under the note, and that Olentangy would look only to the collateral described in the sublease.

---

[6]See also *Walls v. Commissioner*, T.C. Memo. 1983–504.

The terms of the note limiting petitioner's liability thereon were in full accord with provisions in the sublease agreement with respect to limited liability and with general discussions of the matter found in a private placement memorandum offering working interests in the coal sublease. Thus, for example, the sublease agreement specifically prohibited the pursuit of any legal or equitable action against a sublessee and provided that only a sublessee's interest in the sublease would be subject to execution, attachment, or any other claim or proceeding on account of any obligation of the sublessee. The private placement memorandum stated that the notes "must be paid out of proceeds of coal sales, and the lessor's sole remedy for default is foreclosure of the defaulting Co-Owners' Working Interests, and his share of all chattels located on the Property" and that the notes were to be "non-negotiable and wholly without recourse to any Co-Owner, and the sole remedy of Olentangy in the event of default shall be to terminate the Sublease and proceed against the Co-Owner's Working Interest." It further stated that the "Contract Miner [Big Sandy Creek] has agreed to mine and sell a sufficient amount of coal each year to enable each Co-owner to make all required payments under the Sublease and the Notes." Similarly, the legal opinion attached to the private placement memorandum indicated that it was anticipated that sufficient tonnage would be available for payment of the notes and that the sublessor had agreed to look only to the various co-owners' undivided interests in the property in the event of failure to make any of the payments required under the notes.

The crux of respondent's position herein is that the undisputed facts reveal an illusory obligation to pay minimum royalties, an obligation so contingent in nature as to fail to meet the regulatory *requirement* that a substantially uniform minimum royalty be paid annually over the life of the lease. Respondent believes that the relevant documents—the private placement memorandum, the sublease agreement, and the nonrecourse note—reflect an intention that the note be satisfied solely from coal sales proceeds. Such being the case, respondent asserts that there is no certainty that the minimum royalties will ever by paid, since payment, in effect, is conditioned on the sale of coal.

We agree with respondent that, by their terms, the documents reflect an intention that petitioner's note be satisfied out of coal sales proceeds. Indeed, petitioner acknowledged as much in his petition to this Court, when he stated that "The principal amount of the Notes, and all interest thereon, was payable out of the proceeds of coal mined from the Property and sold by the Program, and the Notes imposed no personal liability on the Co-owners or on any Co-owner." Petitioner's execution of a nonrecourse note, payments on which were contingent on coal sales proceeds, does not establish an enforceable *requirement* that substantially uniform minimum royalties be paid annually in any event, regardless of annual production. The contingent nature of the note is inherently inconsistent with the regulatory definition of a minimum royalty provision. *Wing v. Commissioner, supra* at 40.

In his memoranda in opposition to respondent's motion for partial summary judgment, petitioner contends that, since in the absence of mining operations, Big Sandy Creek was obligated under the terms of the mining services contract to pay liquidated damages in an amount sufficient to amortize the notes payable to Olentangy, the notes would in fact be paid—either out of actual mining operations proceeds or out of the liquidated damages.

Presumably petitioner's contention is not premised on the proposition that eventual payment establishes the existence of a *requirement* for payment since we have already rejected a similar argument in *Wing v. Commissioner, supra*. The taxpayer there contended that, since his note was collateralized by sufficient coal reserves, the note would in fact be paid—either in cash or through the loss of valuable property (the coal reserves) upon foreclosure of the lease. In response to the taxpayer's contention, we stated—

Again, this argument misses the mark. To qualify for the deduction, the petitioner must meet the terms of the regulation, which sets out that a minimum royalty provision must *require* payment at least annually. That the note may in fact be paid at some later date is not sufficient to establish the existence of such a requirement. * * * [81 T.C. at 40–41.]

To the extent that petitioner's contention is premised on the proposition that the existence of the liquidated damages clause in the mining services contract guarantees payment of peti-

tioner's note and eliminates the otherwise contingent nature of the note, we disagree. Under the undisputed facts before us, we conclude for the reasons hereinafter discussed, that the existence of the liquidated damages clause in the mining services contract does not combine with the other documents to establish an enforceable *requirement* for substantially uniform annual payments of minimum royalties. In fact, we are inclined to agree with respondent that the provisions of the mining services contract simply highlight the uncertainty that payments would ever be made on the note.

As respondent points out, the obligation to pay the purported advanced minimum royalties was an obligation that burdened solely petitioner and the other investors in the coal program. Although Olentangy agreed to accept the liquidated damages as a credit against the investors' note obligations, it does not appear under the terms of the sublease or the nonrecourse notes that Olentangy had the power to look to Big Sandy Creek for payment on the notes. In other words, the agreement by Big Sandy Creek to pay liquidated damages to Investors Mining, although contemplated as a mechanism by which to amortize the notes executed by the investors, did not have the legal operative effect of guaranteeing payments under the notes. At best, the investors merely possessed a potential claim for liquidated damages against Big Sandy Creek.

Furthermore, and perhaps most significantly, the relationship between Olentangy and Big Sandy Creek, the financial condition of Big Sandy Creek, and the contemplated method of paying liquidated damages convince us that petitioner may not rely on the provision for liquidated damages to establish the requisite enforceable requirement that minimum royalties be paid. As previously noted, both Olentangy and Big Sandy Creek were owned by the same four individuals, one of whom also served as the president of Olentangy. The private placement memorandum stated that Big Sandy Creek was a newly formed corporation with limited financial resources and warned that there was no assurance that Big Sandy Creek would be financially responsible with respect to its obligations. Under the terms of the mining services contract and the modification thereto, Big Sandy Creek had the sole discretion to pay liquidated damages either in cash or in notes payable to

Olentangy. In turn, Olentangy agreed to accept from the investors, without recourse, any notes received by the investors from Big Sandy Creek and to apply such notes as credits against the investors' obligations to pay the purported minimum royalties. Considering the close affiliation between Olentangy and Big Sandy Creek and the limited financial resources of the latter, it is highly unlikely that any notes, executed by Big Sandy Creek and applied as credits against petitioner's obligation to pay the purported royalties, would actually be enforced. We cannot envision the left hand suing the right hand. At any rate, under these circumstances, the provision for liquidated damages falls far short, in our view, of establishing an enforceable requirement to pay a substantially uniform amount of royalties at least annually over the life of the lease.

Finally, under certain circumstances spelled out in the mining services contract, either the investors or Big Sandy Creek could terminate the contract and thereby eliminate any further obligation of Big Sandy Creek to pay liquidated damages. Thus, for example, the contract provided that co-owners owning a majority interest in Investors Mining possessed the right to terminate the contract without cause by giving 120 days' prior written notice to Big Sandy Creek. A subsequent modification to the mining services contract provided that, in the event the sublessees should elect to terminate the contract, Big Sandy Creek's obligations would cease and be of no further force and effect, and Big Sandy Creek would have no further liability under the contract.

The mining services contract further provided that the failure of either party to perform its obligations under the contract as a result of such events as acts of God, strikes, labor disputes, lockouts, slowdowns, fires, explosions, flood, or extremely adverse weather conditions would not constitute a breach of the contract. However, if such failure were to continue for a period in excess of 60 days, or if caused by strikes or other labor disputes, in excess of 120 days, either party would have the right to cancel the agreement. In this connection, the private placement memorandum specifically discussed potential labor problems, stating as follows:

The Contract Miner intends to use union labor on the Program's property. The National Bituminous Coal Wage Agreement which controls labor wages in the coal industry is currently the subject of renegotiation and expires

effective December 8, 1977. A labor strike has resulted from this renegotiation. West Virginia has recently experienced a wildcat miners strike which lasted ten (10) weeks. If a new Wage Agreement is not successfully negotiated by December 8, 1977, a prolonged strike will have an adverse consequence on the affairs of the Program and, if such strike should continue for an extended period, it might cause the Program to default on its obligations and thereby cause the Co-owners to lose their investment.

The private placement memorandum further warned that "the history of the coal industry is marked by numerous and extended labor strikes, work stoppages and other labor disputes." In view of the undisputed information set forth in the private placement memorandum, we certainly cannot say that termination of the mining services contract by reason of labor problems was merely a remote possibility.

For all the foregoing reasons, we conclude that the royalties paid by petitioner in 1977 were not paid "as a result of a minimum royalty provision." Therefore, petitioner is not entitled to a deduction in 1977 for advanced royalties since no coal was sold in that year. Respondent's motion for partial summary judgment will be granted.

*An appropriate order will be entered.*