JOSEPH H. GREEN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Green v. Commissioner
Docket No. 13063-85.
United States Tax Court
T.C. Memo 1987-29; 1987 Tax Ct. Memo LEXIS 29; 52 T.C.M. (CCH) 1392; T.C.M. (RIA) 87029; January 13, 1987
William H. Orton, for the petitioner. Mark H. Howard, for the respondent. GERBER
MEMORANDUM OPINION GERBER, Judge: This case is before the Court on respondent's motion for summary judgment and petitioner's cross-motion for summary judgment, each *31 filed pursuant to Rule 121. [1] Respondent determined a deficiency in petitioner's 1980 Federal income tax in the amount of $4,795 by a notice of deficiency dated February 15, 1985. [2]
The issue for our consideration is whether certain amounts paid by petitioner in the form of cash and a promissory note constitute payment of "advance minimum royalties" for 1980 within the meaning of section 1.612-3(b)(3), Income Tax Regs.
The pleadings, affidavits and exhibits attached thereto constitute the "record" for the purpose of ruling on these motions. The facts and inferences to be drawn therefrom are viewed in the light most favorable to the party opposing the motion. Adickes v. Kress & Co.,398 U.S. 144, 157 (1970); Jacklin v. Commissioner,79 T.C. 340, 344 (1982). *32 Petitioner resided in Honolulu, Hawaii, at the time the petition herein was filed. In 1974 Cascade Energy and Metals Corporation (Cascade), a Nevada corporation, purchased a mine located approximately 15 miles east of Baker, California, and a group of seven mining claims. [3] In May 1976 Cascade leased the mine and mining claims to Telegraph Mine Limited (Telegraph), a Utah limited partnership in which Cascade was the general partner. Subsequently, Telegraph entered into a joint venture with Rex Montis Silver Company, a Utah corporation, and Gold Technics Limited, a California limited partnership (Telegraph Mine Joint Venture). [4] Interests in the mine and mining claims were sold to investors, through Telegraph Mine Joint Venture, in units of one thirty-fifth interest or fractions thereof. The estimated recoverable reserves available to Cascade and Telegraph Mine Joint Venture in 1980 was 72,000 tons. *33 Petitioner purchased one-half of a one thirty-fifth interest, i.e., a one-seventieth interest sometime during 1980, [5] pursuant to which he signed a document entitled "Telegraph Mining Associates Working Interest Agreement and Sublease" (Sublease). The other one-half of this one thirty-fifth interest was purchased by Charles Y. Higashi. Under the Sublease, petitioner and Charles Higashi, as holders of a unit, were entitled to mine and remove gold and silver ore in return for a "minimum annual royalty" payment, commencing on the date of executing the Sublease until all minable and merchantable gold and silver had been recovered. The Sublease signed by petitioner was dated December 20, 1980. Under the terms of the Sublease, "minimum annual royalty" payments for each unit were to be made as follows: (1) 1980 -- a cash payment of $30,000 and a 12-percent interest-bearing recourse note in the amount of $44,285.71; (2) 1981 -- on or before July 1, 1981, a cash payment of $30,000 and a 12-percent interest-bearing *34 recourse note in the amount of $44,285.71; (3) all years after 1981 -- a promissory note could be given for the unpaid balance of the $74,285 annual royalty not paid through production. The terms of the royalty notes executed as payment of royalties due for years after 1981 were to be similar to those given for 1980 and 1981, except that the term of the post-1981 notes was not to exceed the lease term. [6] The 1980 and 1981 royalty notes were to be paid the earlier of December 31, 1991, or the generation of amounts due through production. All promissory notes executed pursuant to the Sublease as payment of the royalties were to be made payable to Cascade. Petitioner's one-seventieth interest required him to make "minimum annual royalty" payments of $15,000 cash and a promissory note in the amount of $22,143 for both 1980 and 1981, with $37,143 due for each year after 1981, paid out of production, by promissory note, *35 or a combination thereof. The royalty payment for 1980 was made, in part, with a check dated January 10, 1981, in the amount of $9,720. [7] The Sublease contains the following provision with respect to default: Default. * * * any failure on the part of the Sublessee to make any payment or perform the work as herein provided, or to comply with any other requirements of this Sublease at the time and in the manner herein provided, shall be an event of default of this Agreement. If any event of default occurs and remains unremedied, the Sublessor shall have the right upon thirty (30) days notice to the Sublessee to terminate this Sublease. In case of the termination of this Sublease for any cause, any payments theretofore made, whether by percentage of ore produced, or otherwise, shall belong to the Sublessor as rental for the property and as consideration for this Sublease; and Sublessee shall have no right or claim against the property or the Sublessor therefor. The waiver of any beach [sic] of any of the conditions and covenants of this Sublease shall not constitute a waiver of any subsequent breach of the same, or other, or different conditions or covenants of this Sublease. *36 [Emphasis added.] Paragraph 19 of the Sublease further provides: Remedies on Default. Sublessor reserves the right to pursue any and all other remedies available under the law of the State of California for violation of any covenant or condition hereof except as may be otherwise provided herein. Upon any such default by Sublessee and so long as the same shall continue, Sublessee agrees that it will not remove or permit to be removed or taken away from the premises any personal property, mining machinery or equipment of any kind or description of the Sublessee situated upon the leased premises, all of which shall remain subject to the lien herein reserved by Sublessor. In the event of Sublessee's *37 default paragraph 20 provides, in pertinent part, as follows: Repossession of the Premises. Except as may be otherwise provided for herein, if default be made by Sublessee in the payment of the Royalty or in the performance of any other terms or conditions hereof required to be kept and performed by Sublessee and such default shall continue for a period of one month after written notification thereof to Sublessee, then, in such event, and as often the same occurs, Sublessor may, at its option, terminate this Sublease and reenter upon and take possession of the Sublessee's interest in the leased gold, silver and other minerals and leased premises and every part thereof, and be reinstated in its possession to hold as if this Sublease had not been made. Such action by Sublessor shall constitute the Sublessor's sole remedy in the event of default in payment of the rent and shall result in the forfeit of its right to rent due or accrued up to the time of such termination and reentry.[8] [Emphasis added.] In addition to the Sublease, *38 petitioner was required to execute a security agreement which secured all notes issued in payment of the "minimum annual royalties." Pursuant to the security agreement the secured party, in the event of default, was entitled to possession of the collateral, i.e., the mine property, in satisfaction of the sublessee's liabilities and obligations. Additionally, petitioner was required to execute a Joint Operating Agreement (Operating Agreement). This agreement restricted investors with respect to the sale of their interest in the Telegraph Mine Joint Venture and required approval from both the operating manager and counsel for the Joint Venture that such sale would not require registration under the Securities Act of 1933, the California Corporations Code or other applicable statutes. The Operating Agreement also set forth the authority and duties of the operating manager including indemnification rights, the allowed compensation and expenses, and a duty to develop the property; the investors' right to a pro rate share of the minerals mined; and investors' liability which was limited to each investor's proportionate share of expenses and obligations incurred in connection with production. *39 [9]
The promotional materials for Telegraph Mine Joint Venture indicated that production from the proposed mining operation would begin in October 1981. In April 1982 Cascade began production using mining and processing methods different from those proposed in 1980. By the end of 1982 all mining activities had ceased; no mining operations have been resumed as of this date. Petitioner, on Schedule C of his 1980 Federal income tax return, deducted as an expense of the "Green & Higashi Mining" activity an "annual minimum royalty payment" of $37,143. In his notice of deficiency respondent disallowed the full amount. [10]
Respondent, relying on section 1.612-3(b)(3), Income Tax Regs., argues that as a matter of law the $37,143 petitioner "paid" as "minimum annual royalties" for 1980 *40 is not deductible in that year because they do not meet the regulatory requirements. Moreover, respondent argues that petitioner is not entitled to the deduction for 1980 because no ore was produced or sold in that year. In support of his contentions respondent asserts that the royalties paid do not qualify as "advanced minimum royalties" within the meaning of section 1.612-3(b)(3), Income Tax Regs., because (1) they fail the "substantial uniform annual payment" requirement, (2) petitioner had the unfettered discretion to determine the duration of advance royalty payments, section 1.612-3(b)(3), Income Tax Regs., and (3) the royalty notes given by petitioner do not meet the all events test. Alternatively, respondent argues that the deduction should be disallowed under section 465 [11] because petitioner was not at risk with respect to the amount represented by the promissory notes. Petitioner's cross-motion for summary judgment requests that we find, as a matter of law, that the deductions claimed for minimum royalty payments should *41 be allowed in the full amount because (1) the royalty payments are payable in all events, (2) the notes meet the all events test of the accrual method, and (3) petitioner was at risk with respect to all amounts deducted. A motion for summary judgment is granted when the moving party shows that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. Rule 121(b); Shiosaki v. Commissioner,61 T.C. 861, 863 (1974). Respondent has met this burden. [12]
*42 Section 1.612-3(b)(3), Income Tax Regs., generally provides that advanced royalties may be deducted only in the year in which the mineral product for which the royalties were paid or accrued is sold. There is an exception, however, for the deduction of "advanced minimum royalties" paid or accrued as a result of a minimum royalty provision. Under this exception "advanced minimum royalties" may, at the option of the payor, be deducted in the year they are paid or accrued. The regulation requires that a minimum royalty provision be satisfied by a "substantially uniform amount of royalties [to] be paid at least annually either over the life of the lease of for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount." Thus, to qualify for the deduction petitioner must show that the royalty provision contained in the Sublease required royalties of a substantially uniform amount to be paid at least annually over the life of the Sublease. In Wing v. Commissioner,81 T.C. 17 (1983), this Court examined whether royalties of a substantially uniform amount were required to be paid annually. In *43 the case five-sixths of the total minimum royalty due under the lease was to be made by means of a nonrecourse promissory note. There, we held that section 1.612-3(b)(3), Income Tax Regs., would allow current deductions for "advance minimum royalties" which were required to be paid regardless of production and were properly allocable to that year. Consequently, we held that notes to be paid from production proceeds, because of their contingent nature, were inherently inconsistent with the regulatory definition of a "minimum royalty provision." Furthermore, we stated: To qualify for the deduction, the petitioner must meet the terms of the regulation, which sets out that a minimum royalty provision must require [emphasis in original] payment at least annually. That the note may in fact be paid at some later date is not sufficient to establish the existence of such a requirement. [81 T.C. at 40-41. Fn. ref. omitted. Emphasis added.] Petitioner contends that Wing is not applicable here because, unlike the notes in Wing, the notes given here are recourse, therefore, (1) petitioner's obligations under the notes are fixed and the amount is known, (2) *44 petitioner's obligations under the notes are not contingent upon any condition, and (3) the obligations under the notes cannot be avoided by petitioner's willful default. We disagree with petitioner's contentions. In determining whether the requirements of the minimum royalty provision have been met, we must look to the agreement as a whole, along with any pertinent background information. Petitioner, as part of his investment in Telegraph Mine Joint Venture, was required to execute a sublease and a security agreement. Pursuant to the Sublease, the "minimum annual royalty" payment for 1980 was made partly in cash and partly with a promissory note. Under the terms of this note, read in conjunction with the terms of the Sublease, no payment was required in 1980 or 1981; interest accrued in both years and was added to the full value of the note. During 1982, and all years thereafter, payment on the notes was to be made quarterly from the production of gold and silver at a rate of $13.44 per ton, with any remaining balance to be paid no later than the termination of the lease or December 31, 1991. Petitioner, however, could default on all notes, giving Telegraph Mine Joint Venture *45 the option of terminating the Sublease and repossessing the property. This would be its sole remedy. Contrary to petitioner's claim, his obligations under the notes were contingent upon his continued participation in Telegraph Mine Joint Venture. Thus, the purported recourse nature of the notes is illusory. The notes and obligations, even viewed most favorably to petitioner, require a conclusion that they are contingent in nature. It is not sufficient that these notes have been labeled recourse notes. [13] Rather, we must look to the substance and natural consequences of these transactions. Gregory v. Helvering,293 U.S. 465 (1935). We find this case to be no different from the many cases in which this Court has already held that for purposes *46 of section 1.612-3(b)(3), Income Tax Regs., notes payable from mining production are too contingent to qualify as annual payments. See Wing v. Commissioner,81 T.C. at 40; Maddrix v. Commissioner,83 T.C. 613, 623 (1984), affd. 780 F.2d 946 (11th Cir. 1986); Vastola v. Commissioner,84 T.C. 969, 978 (1985). [14] In the present case the substance of the transaction undoes what appears to be an annual payment of substantially uniform royalties. The royalty notes are purportedly recourse. When viewed in connection with the security agreement and the Sublease, however, the notes are nothing more than nonrecourse. The promissory note agreement is captioned "Recourse Royalty Note" and provides that it is secured by and subject to the security agreement. Upon petitioner's default the sublessor *47 could effectively only look to the interest in the mining property for security; the repossession of this property becomes the sole remedy for the sublessor. [15] Telegraph Mine Joint Venture has no greater rights than it would have had under nonrecourse notes. The net effect of the transaction herein is to render the existence of the notes economically insignificant to either party. Petitioner argues that should Telegraph Mine Joint Venture elect to repossess his interest in the mining property this would be its sole remedy only with respect to the year of default and all years remaining on the Sublease. We find nothing in the record to support this contention. The effect of the repossession agreement contained in petitioner's Sublease is to provide complete satisfaction of all outstanding notes as well as all future payments through repossession.We cannot accept petitioner's implication that the *48 sublessor would opt not to repossess the mining property. Petitioner contends that the royalty notes represent amounts that are payable in all events and therefore, should be fully deductible. Contrary to his claim, petitioner does not unconditionally obligate himself to pay the executed royalty notes. Notes executed pursuant to the Sublease were to be paid from the production of gold and silver at a rate of $13.44 per ton, with any outstanding balance to be paid no later than December 31, 1991. These terms were applicable to the royalty notes executed for 1980 and 1981. As in Wing,Maddrix,Vastola and Capek v. Commissioner,86 T.C. 14 (1986), we find that the notes permit deferral of payment of the minimum annual royalties; payment that may never be made. Therefore, such notes do not qualify as annual payments within the meaning of section 1.612-3(b)(3), Income Tax Regs.Inherent in the definition of "minimum annual royalties" is the requirement that there be an enforceable provision of guaranteed payment. Eventual payment does not satisfy such a requirement. Wing v. Commissioner,81 T.C. at 41; Maddrix v. Commissioner,83 T.C. at 623; *49 Capek v. Commissioner,86 T.C. at 46. Moreover, petitioner's unfettered discretion to walk away from the transaction at any time without penalty is fatal to the qualification of the royalty notes under section 1.612-3(b)(3), Income Tax Regs. We agree with respondent that this is but another variation of a transaction where petitioner has the unfettered discretion to determine how many years the "advance minimum royalties" would be made, if at all. Petitioner contends that such termination on his part would not be without a penalty: a loss of all payments already made which would become rent to the sublessor. We find this argument unpersuasive. Petitioner sought to secure a $2.50 deduction for every dollar invested in the first two years and deductions with zero cash investment for years thereafter. This is hardly a penalty. Petitioner alternatively argues that the royalty payments are deductible under the accrual method of accounting. Petitioner maintains that because he has adopted Cascade's accrual method of accounting and the royalty notes meet the all events test they are deductible irrespective of section 1.612-3(b)(3), Income Tax Regs. We disagree. *50 We have already held that the royalty notes constitute a contingent liability. It is well established that a liability which can be cancelled in the future does not give rise to a fixed and absolute obligation. See Brown v. Helvering,291 U.S. 193 (1934); Lucas v. American Code Co.,280 U.S. 445 (1930); Weiss v. Wiener,279 U.S. 333 (1929). Moreover, an obligation which is not fixed and absolute does not give rise to a deductible liability. See [16]Brown v. Helvering,supra at 201; Lucas v. North Texas Lumber Co.,281 U.S. 11, 13 (1930). Respondent alternatively argues that even if we were to find that the payments qualify as "advance minimum royalties" within the meaning of section 1.613-3(b)(3), Income Tax Regs., they would otherwise be nondeductible pursuant to section 465(a)(1). [17] Petitioner counters that the amounts he invested in Telegraph Mine Joint Venture were either cash or borrowed funds which qualify as amounts at risk within the meaning of section 465(b). We agree with respondent. *51 Section 465(b) provides that borrowed funds will be considered amounts at risk if the taxpayer is personally liable for the repayment of such funds or has pledged property, other than the property used in such activity, as security for such borrowed amounts. We have already determined that petitioner was not personally liable on the royalty notes; moreover, the only property petitioner pledged as security for said notes was his interest in Telegraph Mine Joint Venture. Accordingly, we hold that petitioner was not at risk for the amounts represented by the royalty notes. Pursuant to section 6621(d)(1), [18] respondent, in his answer, raised an additional issue concerning the application of the increased rate of interest *52 that is applicable where a portion of the deficiency constitutes a substantial underpayment attributable to tax motivated transactions. Under section 6214(a), this Court has jurisdiction to consider a claim by the Commissioner for an increased deficiency or addition to tax at any time before the entry of a final decision. Ferrill v. Commissioner,684 F.2d 261, 265 (3d Cir. 1982), affg. per curiam a Memorandum Opinion of this Court; Henningsen v. Commissioner,243 F.2d 954 (4th Cir. 1957), affg. 26 T.C. 528 (1956). The right to claim an addition to tax, however, is not unqualified, Commissioner v. Estate of Long,304 F.2d 136 (9th Cir. 1962), affg. unreported orders of this Court; Commissioner v. Erie Forge Co.,167 F.2d 71 (3d Cir. 1948), affg. a Memorandum Opinion of this Court; but rather, must be guarded in the interest of justice. See Rule 41(a). This additional issue raised by respondent does not present any new legal issues, neither will it require a separate trial. Petitioner was not without notice of this issue; on the contrary, petitioner fully addressed this issue on brief. Therefore, *53 our consideration of this issue does not unfairly prejudice petitioner. The increased interest rate applicable under section 6621(d) is 120 percent of the interest rate otherwise applicable to income tax underpayments under section 6621(b). The increased interest rate, where applicable, applies only with respect to interest accruing after *54 December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(d). Deficit Reduction Act of 1984, sec. 144(c), Pub. L. 98-369, 98 Stat. 682; Stanley Works & Subsidiaries v. Commissioner,87 T.C. 389 (1986); Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). "Tax motivated transactions" are defined in section 6621(d)(3) as, among others, (1) any "valuation overstatement" as defined in section 6659(c), and (2) any loss disallowed by reason of section 465(a). Section 6659(c) provides that a valuation overstatement is present if the value of any property or adjusted basis of any property claimed on a return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis, as the case may be. Respondent's primary position is that the deduction claimed by petitioner is disallowed pursuant to section 465 which constitutes a tax motivated transaction for purposes of section 6621(d). We agree with respondent. We have held that petitioner was not at risk with respect to the amount represented *55 by the promissory notes, thus, the question remains whether the disallowed royalty deduction resulted in a substantial underpayment. A substantial underpayment is an underpayment of income tax which exceeds $1,000 and which is attributable to one or more tax motivated transactions. Sec. 6621(d)(2). In the present case the disallowed royalty note constitutes approximately 60 percent of the total deduction claimed ($22,143/$37,143). Even if we were to attribute only 60 percent of the total deficiency to the royalty note, the amount so attributed would exceed the required $1,000. Thus, we hold that respondent may apply the rate of interest as provided in section 6621(d)(1). Consequently, respondent's motion for summary judgment will be granted and petitioner's cross-motion will be denied. An appropriate order will be entered.
Footnotes
1. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Respondent, in his answer to petitioner's petition, alleges that a portion of the deficiency constitutes a substantial underpayment attributable to tax motivated transactions, under the provisions of sec. 6621(d), I.R.C. 1954, and seeks the higher rate of interest provided for in sec. 6621(d)(1), I.R.C. 1954↩.
3. The mine was previously operated from 1932 to 1948, during which time it produced gold and silver ore from underground workings. The ore was produced from a relatively small section of a 4-foot wide granite vein. ↩
4. Telegraph Mine Joint Venture is referred to as Telegraph Mining Associates in many of the documents submitted as part of the record.↩
5. The Sublease and the Joint Operating Agreement were both signed and dated Dec. 20, 1980; neither the note nor the security agreement was signed or dated.↩
6. Because the term of the Sublease extends "until all minable and merchantable gold and silver has been recovered by Sublessee from the Mining Claims * * *," its term is an indefinite lease term. Therefore, the post-1981 royalty notes are also indefinite.↩
7. This check was executed as payment of a note executed on Dec. 2, 1980, for the balance due on the 1980 $15,000 cash portion of the royalty payment. The remaining $5,280 was offset by consulting fees due petitioner from Telegraph Mine Joint Venture. The record does not contain any evidence of a note executed by petitioner for the 1980 outstanding royalty balance. An unexecuted copy of the promissory notes, allegedly executed by all investors, was submitted as evidence.↩
8. The term "rent" as used herein refers to the royalty payments. There is no separate requirement for rent payments in the Sublease.↩
9. The Operating Agreement designated Cascade as the operating manager of the Telegraph Mine Joint Venture.↩
10. Adjustments to the charitable contribution and medical expense deductions were made as a result of the change in petitioner's adjusted gross income; the sales tax deduction was increased by $259 and self-employment tax was computed on net earnings from petitioner's sales activities.↩
11. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise indicated.↩
12. Respondent filed a Request for Admissions on Dec. 20, 1985. Pursuant to Rule 90, petitioner was required to file a response admitting or denying the facts set forth therein within 30 days after service. Petitioner failed to timely comply. Petitioner claims that his answer was timely filed pursuant to an agreement he entered into with respondent. The Court file and docket sheet do not reflect or contain the alleged response. Respondent, in his Notice of Objection to Petitioner's Motion for Summary Judgment, states that petitioner provided him with an unsigned document entitled "Petitioner's Response to Respondent's Request for Admissions." Even if we were to assume that it is this document to which petitioner refers as his filed answer, this does not constitute a filing within the meaning of Rule 90. On brief petitioner contends that the due date for his response to respondent's Request for Admissions was extended pursuant to an agreement entered into by counsel for the parties. In support of this contention petitioner cites the affidavit of his attorney, a series of telephone conversations between his attorney and counsel for respondent, and a meeting where petitioner alleged that it was agreed to extend the due date of his response to the first week of Feb. 1986. There is no record of any such agreement and, furthermore, respondent denies entering into such an agreement with petitioner. Petitioner's attorney's affidavit is precatory and contains statements such as: "It was Affiant's understanding that Counsel for Respondent concurred with this time schedule," and "Affiant presumed that the agreement of the subsequent conference had extended the date for responding to said Request for Admissions" (emphasis added). In light of the clear mandate of Rule 90, these presumptions and assumptions do not serve to waive the deadline for petitioner's required answer. Consequently, the facts set forth in respondent's Request for Admissions are deemed admitted for purposes of this proceeding. See Rule 90(c); Freedson v. Commissioner,65 T.C. 333, 335 (1975), and cases cited therein, affd. 565 F.2d 954↩ (5th Cir. 1978). Although we have addressed this procedural point, it is of little import because neither party alleges a material disputed fact.
13. Even if we were to find that the notes are true recourse notes, their deductibility under sec. 1.612-3(b)(3), Income Tax Regs., is questionable in light of our analysis in Capek v. Commissioner,86 T.C. 14↩ (1986), where we stated that whether the notes were recourse or nonrecourse is irrelevant where the notes would require payment after the close of the taxable year for which such notes were issued.
14. See also Kaji v. Commissioner,T.C. Memo. 1985-341; King v. Commissioner,T.C. Memo. 1985-340; Hershenhorn v. Commissioner,T.C. Memo. 1985-286; Gibson v. Commissioner,T.C. Memo. 1984-616; Chidnese v. Commissioner,T.C. Memo. 1984-612↩.
15. We find this provision to be in direct conflict with the substance of a true recourse note transaction where the secured party retains the right to recoup any deficiency in the outstanding debt above the value of the repossessed property from the personal assets of the debtor.↩
16. See also United States v. Hughes Properties, Inc.,↩ 86-1 USTC par. 9440.
17. Sec. 465 (a)(1) provides, in relevant part, as follows: (a) Limitation to Amount at Risk. -- (1) In general. -- In the case of -- (A) an individual, * * * engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year.↩
18. Sec. 6621(d) provides in pertinent part as follows: (d) Interest on Substantial Underpayments Attributable to Tax Motivated Transactions. -- (1) In general. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the adjusted rate established under subsection (b). (2) Substantial underpayment attributable to tax motivated transactions. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.↩